**UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

No. 93-3643

UNITED STATES OF AMERICA,

Plaintiff-Appellee/
Cross-Appellant,

versus

JOHN E. SEAGO, GEORGE C. CAVIN,
and GERALD J. DAIGLE, JR.,

Defendants-Appellants,

JOHN E. SEAGO and GERALD J. DAIGLE, JR.,

Defendants-Appellants/
Cross-Appellees.

Appeals from the United States District Court
for the Eastern District of Louisiana

(December 2, 1994)

Before POLITZ, Chief Judge, DUHÉ and BARKSDALE, Circuit Judges.

POLITZ, Chief Judge:

Gerald J. Daigle, Jr., George C. Cavin, and John E. Seago appeal their convictions for conspiracy to defraud the Louisiana insurance regulators and related substantive offenses. For the reasons assigned we reverse in part and vacate and remand in part.

Background

In 1987 David B. Ridgeway, an insurance executive, established

his own company, Alliance Casualty and Reinsurance Company. Under Louisiana law, Alliance needed $1.5 million in assets to receive an operating license from the Commissioner of Insurance. Unable to raise the funds, Ridgeway persuaded Dieter Hugel, a friend and investor, to loan him $1 million on a short-term basis. Ridgeway did not report to the Commissioner that two-thirds of the company's capital was merely a short-term loan. Nor did he reveal that a $50,000 investment by Glynn Pittman, another friend, was also a loan or that Pittman had invested $35,000 on behalf of Larry Stoulig, a principal in Alliance's outside auditor, Stoulig & Buckley.

Ridgeway's efforts were assisted professionally by Daigle, an associate soon to become partner at a prestigious New Orleans law firm. As Alliance's outside counsel, Daigle prepared the private placement memorandum used to attract investors and the application for a Certificate of Authority from the Louisiana Insurance Commissioner.

Alliance's certification application was filed but Sherman A. Bernard, then Louisiana Insurance Commissioner, took no action until Ridgeway paid him $10,000. The certificate issued on March 9, 1988 and Alliance commenced business.

From the start, solvency was a problem. Louisiana law required domestic insurers to maintain $1.5 million in policyholder surplus; otherwise they would be subject to regulatory action, up to and including liquidation.[1] In addition, Alliance was required

_____

[1]See La. R.S. 22:733.

2

to maintain a ratio of net premiums to surplus that did not exceed 3-to-1. To replace the $1 million repaid to Hugel, acting through Alliance's holding company, Alliance Management Group,[2] Ridgeway entered into a stock rental transaction. In exchange for monthly payments of $10,000, AMG received a term assignment of 500,000 shares of Chaparral Mining Company stock with a purported value of $1 million. AMG in turn transferred the stock to Alliance which reported it to the Commissioner as an unencumbered asset. Daigle reviewed the documentation and accompanied Ridgeway to the closing of the transaction in Denver. According to Ridgeway, the two joked on the return trip about the purported value of the stock; neither believed it was really worth $1 million.[3] The transaction was closed in January 1989 but the agreement was dated December 15, 1988 and reported on Alliance's 1988 annual statement.

Despite the infusion of the stock, Alliance showed only a $489,662 surplus on its June 30, 1989 quarterly report. The report caught the attention of the Commissioner's office, which threatened to place Alliance in administrative supervision unless it raised $1 million in additional capital by September 30. Unable to do so, Ridgeway used $800,000 in premium payments and a short-term loan from Hugel to create the illusion of $1 million in new assets. Ridgeway testified that Daigle knew the source of the funds,

---

[2]AMG, which was owned 90 percent by Ridgeway and 10 percent by Hugel, owned 90 percent of Alliance's common stock; Hugel owned the remaining 10 percent. Alliance's other investors owned preferred stock.

[3]50,000 shares were ultimately sold for 50 cents per share and the remaining shares were written off as without value.

advised him to proceed, and drafted a letter to lend authenticity to the purported capital contribution.

For the 1989 annual statement a $700,000 note swap was structured. Ridgeway obtained a $350,000 promissory note in favor of Alliance from Coordinated Financial Planners, a company owned by a friend, in exchange for a nominal fee and AMG's note at a slightly higher interest rate. Daigle obtained a similar note from Marmex International, an inactive company owned by clients, also in exchange for a small fee. Neither CFP nor Marmex were indebted to Alliance or AMG. The notes were reported as assets on the year-end 1989 statement, even though Wayne Ducote, designated by the Commissioner as Alliance's informal supervisor, rejected them as "B.S. transactions."

The 1989 annual statement also reflected as an unencumbered asset a $1 million asset-backed bond issued by American Midwest Capital Corporation (AMCC). In a transaction brokered by Cavin and reviewed by Daigle, the bond was assigned to Alliance for a three-year term in exchange for AMG's debenture and monthly interest payments. The bond purportedly was collateralized by $1 million in Federal National Mortgage Association securities which in reality were purchased by AMCC on margin; the available equity was only $158,000. In addition, Ridgeway again turned to Hugel for another $1 million loan which, like the other loans, was repaid immediately after the end of the reporting period.

The Commissioner disallowed the AMCC bond and the CFP and Marmex notes, requiring Alliance to raise an additional $1 million

4

by June 30, 1990. Ridgeway could not do so. In lieu thereof, on June 28 he obtained a $1 million check from Seago & Carmichael, a law firm seeking defense work with Alliance. On July 2, AMG issued a $1 million check to Seago & Carmichael. Both checks were dishonored. Nevertheless, the check from Seago & Carmichael was included as a $1 million asset on the June 30 quarterly report.

To dress up the 1990 annual statement, Ridgeway employed a new stratagem which he asserted Daigle orchestrated. On December 31, Ridgeway wrote a $3 million check on AMG's First City Bank account for deposit to Alliance's Whitney National Bank account. At that time the First City account had only a $100,000 balance. Ridgeway then wrote a $3 million check on the Whitney account, which likewise did not have sufficient funds, to buy securities through Legg Mason, Alliance's brokerage house. On January 2, Alliance transferred the securities back to AMG, which sold them and used the sale proceeds to cover the December 31 check. The transaction resulted in a Legg Mason statement showing $3 million worth of securities on December 31, 1990. These were reported as new assets on Alliance's year-end statement to the Commissioner.

Stoulig & Buckley uncovered the substance of the year-end transactions during an audit and expressed its intent to issue a letter indicating an insecure financial condition, but agreed to defer if Ridgeway raised $3 million in real assets. Once again, Ridgeway borrowed the money from Hugel, repaying it immediately after the auditors finished their field work.

Ridgeway tried to repeat the year-end transaction at the close

5

of the first quarter of 1991. This time the scheme did not work; Ridgeway's contact at Legg Mason had died and Legg Mason's head accountant discovered that Alliance's check would not clear. Legg Mason "unwound" the transaction but Alliance nevertheless received a March statement showing the purchase of $3 million in securities which Ridgeway reported as assets on the March 31 quarterly report.

Ridgeway continued to seek additional capital. In April 1991, he submitted a package to Whitney Bank in support of his application for a $5 million loan, containing, among other items, Alliance's 1990 annual statement to the Commissioner. Whitney rejected the loan application.

Ridgeway and Daigle devised another plan. In September 1991 Ridgeway executed a $6 million promissory note from AMG to Alliance, backed by $6 million in U.S. Treasury notes purchased on margin. Although AMG had only $600,000 in equity in the collateral, Ridgeway reported the transaction as a $6 million asset on the September 30, 1991 quarterly report, ignoring Daigle's admonition to book the AMG non-equity interest as a second lien.

Alliance underwent a statutorily required examination in October 1991, which concluded that the company had a negative policyholder surplus of $13 million. It immediately was placed in administrative supervision, then conservation, rehabilitation, and ultimately, liquidation. During Alliance's brief existence, Ridgeway received from it at least $1.5 million in salary, fringe benefits, and personal loans.

Ridgeway, Daigle, Seago, Cavin, and others were named in a

6

22-count indictment charging conspiracy to defraud the state regulators and Alliance policyholders, as well as various fraud offenses. Ridgeway pleaded guilty to all counts and testified for the government. Daigle, Seago, and Cavin, among others, proceeded to trial on a 26-count superseding indictment. All three were convicted of conspiracy in violation of 18 U.S.C. § 371. In addition, Daigle was convicted of two counts of making false representations to a bank in violation of 18 U.S.C. § 1014, two counts of mail fraud in contravention of 18 U.S.C. § 1341, nine counts of wire fraud in violation of 18 U.S.C. § 1343, one count of bank fraud in violation of 18 U.S.C. § 1344, and two counts of illegal monetary transactions in contravention of 18 U.S.C. § 1957. Cavin was convicted of one count of mail fraud, five counts of wire fraud, and one count of an illegal monetary transaction; Seago was convicted of one count of mail fraud and one count of bank fraud. Daigle was sentenced to 60 months imprisonment and ordered to pay $50,000 in restitution, Cavin was sentenced to 42 months imprisonment and fined $25,000, and Seago was sentenced to 12 months imprisonment and likewise fined $25,000. Daigle, Cavin, and Seago timely appealed and the government cross-appealed Daigle's sentence.

## Analysis

1.  McCarran-Ferguson Act immunity.

At the threshold Daigle invokes section 2(b) of the McCarran-

Ferguson Act,[4] which provides:

> No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, . . . unless such Act specifically relates to the business of insurance . . . .

Daigle contends that the Act strips this court of subject matter jurisdiction. We agree with our colleagues of the Second Circuit in their holding in **Dexter v. Equitable Life Assurance Society of United States**[5] that McCarran-Ferguson does not erect a jurisdictional bar. This was not raised in the trial court; we review only for plain error.[6] We find the contention meritless.

Section 2(b) of the Act applies only to those federal statutes that conflict with state insurance regulation.[7] There is no such conflict herein. The government charges the defendants with defrauding Alliance policyholders and the state regulators. Its interest in the fraud prosecution is completely compatible with the state's regulatory interests. Daigle argues that there is a conflict because he is being prosecuted for conduct permitted by the Louisiana Commissioner of Insurance. The argument is not persuasive. His defense to the fraud charges does not trigger the preemption provisions of McCarran-Ferguson.

---

[4]15 U.S.C. § 1012(b).

[5]527 F.2d 233 (2d Cir. 1975).

[6]**United States v. Calverley**, _____ F.3d _____ (*en banc*), slip op. 475 (5th Cir. Oct. 20, 1994).

[7]See **U.S. Department of Treasury v. Fabe**, _____ U.S. _____, 113 S.Ct. 2202, 124 L.Ed.2d 449 (1993) (distinguishing **SEC v. National Securities, Inc.**, 393 U.S. 453 (1969)).

2. <u>Sufficiency of the evidence</u>.

All three appellants contend that the evidence was insufficient to support their convictions. In reviewing a sufficiency challenge we may not reweigh the evidence or impose our preferred interpretation. Rather, we must view the evidence and all inferences therefrom in the light most favorable to the verdict and must affirm if a rational jury could have found that the government proved each element of the offense beyond a reasonable doubt. On the other hand, if the evidence gives equal or nearly equal circumstantial support to a finding of guilty and a finding of not guilty, reversal is in order.[8] Although the evidence in this case is subject to differing interpretations, we are not prepared to say that it is insufficient as a matter of law to support the convictions of Daigle and Cavin, except for those on the illegal monetary transaction counts as discussed herein. The evidence is not sufficient, however, to support Seago's convictions.

a. Daigle.

To establish a section 371 conspiracy, the government must prove that the defendant voluntarily joined at least one other person in an agreement to commit a federal crime and that one or more of the conspirators committed an overt act in furtherance of the agreement.[9] Mail and wire fraud consist of use of the mail or

---

[8]**United States v. Mackay**, 33 F.3d 489 (5th Cir. 1994).

[9]**United States v. Loney**, 959 F.2d 1332 (5th Cir. 1992); **United States v. Yamin**, 868 F.2d 130 (5th Cir.), <u>cert</u>. <u>denied</u>, 492 U.S. 924 (1989).

9

wires, respectively, in furtherance of a scheme to defraud.[10] Bank fraud involves a scheme to defraud or to obtain money from a federal financial institution by false or fraudulent pretenses.[11]

There is evidence that Daigle conspired to defraud the state regulators and Alliance policyholders by use of the mails and wire communications and through bank fraud. According to Ridgeway, Daigle participated in: reporting of Hugel's $1 million loan as start-up capital and of subsequent short-term loans as capital contributions; listing Chaparral stock as an asset; representing policy premiums as a capital contribution during the third quarter of 1989; and including on the 1989 annual statement the CFP and Marmex notes and the $3 million in securities purchased with kited checks and owned for little more than one day. From this the jury could have inferred that Daigle conspired with Ridgeway to inflate Alliance's assets on the reports to the Commissioner.

Daigle's principal defense is that the government failed to prove fraudulent intent, an element of both the conspiracy and substantive charges. Several of the substantive counts were based on the Chaparral stock and AMCC bond transactions. Daigle maintains that the status of these so-called "rental assets" was unclear at the time and therefore he lacked fraudulent intent in assisting Ridgeway to enter into the transactions. The crux of the

---

[10]**United States v. Hatch**, 926 F.2d 387 (5th Cir.), <u>cert</u>. <u>denied</u>, 111 S.Ct. 2239 and 112 S.Ct. 126 (1991); **United States v. Dula**, 989 F.2d 772 (5th Cir.), <u>cert</u>. <u>denied</u>, 114 S.Ct. 172 (1993).

[11]**United States v. Farmigoni**, 934 F.2d 63 (5th Cir. 1991), <u>cert</u>. <u>denied</u>, 112 S.Ct. 1160 (1992).

10

charged fraud was the representation in financial reports to the Commissioner that Alliance had unencumbered ownership of the assets when in fact it only had defeasible temporary interests.[12] There was evidence connecting Daigle to the financial statements, indicating that he intended the misrepresentations. Ridgeway testified that Daigle had free access to Alliance's financial statements and generally reviewed them with Alliance comptroller Nicki Savoie before filing. Savoie testified that he discussed with Daigle how to report the Chaparral stock on the 1988 annual report, that he voiced concerns to Daigle about reported assets "going in and out of the insurance company," and that Daigle instructed him to "make entries and prepare financial reports that went against my better judgment."

Daigle contends that the decisive issue for purposes of the reports was whether the securities were at risk, that is, available to the Commissioner for payment of claims in the event of regulatory action. There was evidence that they were not and that Daigle knew it. Frank O'Bryan, a principal in the Chaparral transaction, testified to an understanding at the closing, which Daigle attended, that "the stock would be initially frozen so that it couldn't be just immediately grabbed." A provision in the acquisition document authorized Chaparral's stockholders to take

---

[12]According to Daigle and Cavin, the reports were accurate in that AMG retained the liability of the note and the rental payments and passed only the assets to Alliance. That argument is beside the point. AMG did not have full ownership. It is axiomatic that AMG could not give Alliance greater rights in the assets than AMG itself had. E.g. **Armstrong v. Ellerslie Planting Co.**, 146 La. 559, 83 So. 830 (1920).

any action necessary to protect their interests in the event of Alliance's insolvency. Similarly, the AMCC rental agreement allowed AMCC to demand immediate return of the asset upon Alliance's insolvency, absent a prior written directive from the Commissioner.

With respect to the AMCC bond, Daigle further contends that he could not have intended to defraud the Commissioner because he reported the details of the transaction to Ducote in February 1990, before the filing of the 1989 annual report. Ducote determined that the transaction was a "phony asset scheme" and prohibited its use on the March 31, 1990 report. But according to Daigle, Ducote accepted the bond on the 1989 statement. The evidence is subject to a different interpretation: Ducote did not approve the inclusion of the bond on the 1989 report, as he testified, but effectively was preempted by the late date of the disclosure. As he wrote to Ridgeway,

> . . . I understand the reason for your not seeking my approval for your two December capital vehicles[:] you did know that I would not approve either but did not want to publish your December 31st statement without these "assets." This action should not be repeated for your first quarter 1990 statement.[13]

The second "December capital vehicle" to which Ducote referred were the $350,000 promissory notes from Marmex and CFP. As with the AMCC bond, Daigle insists that he could not have intended to defraud the Commissioner because he revealed the mechanics of the

---

[13]Indeed, after meeting with Ridgeway and Daigle in November 1989, Ducote wrote the Deputy Commissioner that Ridgeway "is well aware that third party loans, rent-an-asset schemes and other convoluted, non-asset contributions are unacceptable."

transaction to Ducote. Ducote, however, testified that Daigle did not inform him that there was no obligation underlying the CFP and Marmex notes. Moreover, Johan Jullens and Vilma Lecler, the owners of Marmex, testified that Daigle did not explain why he wanted to use the name of their company. According to Jullens, he did not realize the import of the note that he had signed until the FBI confronted him with it, whereupon he rushed to Daigle's office in great distress.

We conclude that the evidence is not sufficient, however, to support a conviction on either of the two illegal monetary transaction counts, counts 23 and 24. The indictment charges the use of criminally derived funds to make rental payments for the Chaparral stock and the AMCC bond. The government presented no evidence that the rental payments were proceeds of criminal activity, an essential element of the offense.[14] Arguably, the inflation of Alliance's financial statements with the rental assets forestalled regulatory action, thereby allowing Alliance to write new business from which the rental payments possibly were derived.[15] Such speculation is no substitute for evidence.

b. Cavin.

Cavin's convictions are based on the AMCC bond transaction.

_____

[14]See **United States v. Johnson**, 971 F.2d 562 (10th Cir. 1992) (Congress intended section 1957 to punish trafficking in the proceeds of illicit activities).

[15]That argument is particularly tenuous with respect to count 24, involving the AMCC bond. The transaction did not forestall regulatory action; Ducote rejected the bond even before it appeared on a financial report.

The government alleges that he conspired with Ridgeway and Daigle to defraud the insurance regulators by brokering the transaction, committing mail and wire fraud in the course of his activities. Like Daigle, Cavin contends that the admissibility of rental assets was unsettled at the time of the transaction and therefore he cannot be found to have harbored fraudulent intent. Because Cavin was in the business of brokering such transactions, the jury could have inferred that he knew that the AMCC bond would be misrepresented on the financial reports to the Commissioner as property owned outright by Alliance. In light of the rental agreement provision allowing AMCC to demand immediate return of the bond, the jury also could have inferred that Cavin knew that the asset was not truly at risk. Evidence that John Peterson, the stockbroker who handled AMCC's FNMA purchases, was a co-owner of Organization of Strategic Services, the company through which Cavin conducted the AMCC transaction, supports the inference that Peterson shared with Cavin his knowledge that the FNMA securities had been purchased on margin. We cannot say that the evidence was insufficient as a matter of law to support conspiracy and mail and wire fraud convictions. For the reasons discussed above, however, we find insufficient evidence to support the conviction on count 24.

c. Seago.

Seago's convictions are based on the $1 million check that his law firm wrote to AMG at the end of the June 30, 1990 reporting period. The government charged Seago with an attempted check kite.

14

To prove its case it had to establish that Seago knowingly participated, or for purposes of the conspiracy count agreed to participate, in a scheme to trick a bank into inflating bank balances, thereby temporarily placing the bank's funds at the disposal of the account holder.[16]  We conclude that the government failed to present sufficient evidence of criminal intent.

The government's evidence was essentially documentary: the Seago & Carmichael law firm check to AMG, written on June 28; the fund transfers in and out of the Alliance account on June 29 and July 2, respectively; AMG's return check to Seago & Carmichael written on July 2; and bank statements showing that neither account had sufficient funds to cover the $1 million checks apart from the reciprocal checks.  Ridgeway explained the transaction as a short-term loan.  Seago testified that he had agreed to allow Ridgeway to use his client account to funnel $1 million of his own money into AMG; he was surprised when Ridgeway asked for the Seago & Carmichael check before tendering his own but acceded in the belief that Ridgeway's check would be forthcoming immediately.  In support of this version of events, Seago's banker confirmed that after writing the overdraft Seago promptly telephoned him to advise of the situation.  Viewing the evidence as a whole, we are not persuaded that a rational jury could have found beyond a reasonable doubt that Seago intended a check kite.  To the contrary, the evidence reflects that Seago did nothing more than write a bad

---

[16]**United States v. Frydenlund**, 990 F.2d 822 (5th Cir.), <u>cert</u>. <u>denied</u>, 114 S.Ct. 192 and 114 S.Ct. 337 (1993).

check to accommodate a prospective client. That does not constitute bank fraud.[17] Further, there is no evidence linking Seago to the inclusion of the $1 million check as an asset on the quarterly report to the Commissioner, required to sustain the mail fraud conviction. Accordingly, the convictions on both the conspiracy and substantive counts are reversed.

    3.    <u>Exclusion of Steeg testimony.</u>

The linchpin of Daigle's defense was that the government failed to prove fraudulent intent. As evidence of good faith Daigle offered the testimony of Moise S. Steeg, Jr., a veteran commercial lawyer, about the ethical constraints under which attorneys operate in the regulatory arena and about the substance of rental asset transactions. The district court excluded this testimony. In so doing, the court abused its discretion and committed reversible error.[18]

One of the basic tenets of our adversarial legal system is that the lawyer owes the client loyalty and zealous representation.[19] That duty includes advocating positions which the lawyer in good faith believes have an arguable basis despite contrary authority.[20] It also includes confidentiality: as a

---

[17]**United States v. Orr**, 932 F.2d 330 (4th Cir. 1991).

[18]<u>Cf</u>. **United States v. Alexander**, 816 F.2d 164 (5th Cir. 1987) (reversing conviction because of exclusion of expert testimony crucial to the defense).

[19]C. Wolfram, <u>Model Legal Ethics</u>, § 10.3 at 578 (1986).

[20]Louisiana State Bar Articles of Incorporation, Art. 16, Rules of Professional Conduct, Rule 3.1, La.R.S. foll. 37:219 (hereinafter Rule . . ., Louisiana Rules of Professional Conduct).

general rule, the lawyer may not divulge client confidences except in very limited instances.[21] These ethical obligations are enforceable; a lawyer violating them may find himself before the state Supreme Court facing sanctions up to and including disbarment.

On occasion a lawyer's responsibility to the client collides with other rules of law. A lawyer may discover that his client is using his services to perpetrate a fraud. An attorney is not above the law; like everyone else, he may not assist in the perpetration of a criminal offense.[22] If he withdraws from representation without blowing the whistle on his client, has he rectified the problem? If he withdraws "noisily," does he violate the duty of confidentiality? In a controversial ethics opinion, the ABA experts concluded that an attorney in such a situation must withdraw from representation and may disaffirm work products used in furtherance of the fraud, even if doing so reveals client confidences.[23] On the other hand, if the fraud has terminated, withdrawal is optional and the lawyer may not blow the whistle.

Sometimes the interplay of conflicting duties is even more

---

[21]Rule 1.6, Louisiana Rules of Professional Conduct.

[22]Rule 1.2(c), Louisiana Rules of Professional Conduct; 1 G. Hazard, Jr. and W. Hodes, <u>The Law of Lawyering</u>, § 1.2:502 at 48 (1993 Supp.).

[23]ABA Formal Opinion 92-366 (Aug. 8, 1992). The ABA opinion justifies the revelation of client confidences as necessary to rectify the fraud. Hazard and Hodes argue that a better justification is preemptive self-defense. 1 Hazard and Hodes, § 1.6:315 at 192.

complex. Under what circumstances, for example, is a lawyer who represents a client in reporting to a regulatory agency, as here, obliged to divulge potentially damaging facts? Under what circumstances is he obliged to maintain silence? The black-letter rule is that the lawyer must disclose a material fact when disclosure is necessary to avoid assisting a criminal or fraudulent act by a client, unless disclosure is prohibited by the rule against revealing client confidences.[24] Because most such disclosures would consist of client confidences, it would seem that disclosure is prohibited, leaving the lawyer in the position of an accomplice. But that is not the rule; a lawyer may not commit a fraud.[25] The parameters of his obligations, however, depend on the circumstances. How active a role does the lawyer play in the reporting process: is he a background advisor or the spokesperson? Is the context such that the agency likely would be misled without disclosure of the damaging fact? Would the omission mislead because of a statement by the lawyer or because of an oversight by the agency? Finally, what if the lawyer reasonably believes that the legal significance of the undisclosed information is such that the agency's reporting requirements do not call for disclosure, but the lawyer suspects that the agency would disagree? One authority holds that disclosure is not required.[26] If disclosure is not

---

[24]Rule 4.1(b), Louisiana Rules of Professional Conduct.

[25]ABA Formal Opinion 93-375 (Aug. 6, 1993); see also 2 Hazard & Hodes, § 4.1:303 at 721.

[26]ABA Ethical Opinion 93-375.

18

required, arguably it is forbidden.

These are some of the complex considerations facing a lawyer whose client is using or has used his services to accomplish a fraud. To the extent that they guide his conduct, they are directly relevant to his intent. We therefore join our Eleventh Circuit colleagues in holding that a lawyer accused of participating in his client's fraud is entitled to present evidence of his professional, including ethical, responsibilities, and the manner in which they influenced him.[27] Exclusion of such evidence prevents the lawyer from effectively presenting his defense.

Similarly relevant to Daigle's intent is evidence of the state of the law with respect to the transactions for which he was convicted. Sitting *en banc* in **United States v. Garber**[28] we reversed a tax evasion conviction because of the exclusion of expert testimony about whether the proceeds from the sale of blood plasma was taxable income. We stated:

> When the taxability of unreported income is problematical as a matter of law, the unresolved nature of the law is relevant to show that [the] defendant may not have been aware of a tax liability or may have simply made an error in judgment. . . . By disallowing [expert] testimony that a recognized theory of tax law supports [the defendant's] feelings, the court deprived the defendant of evidence showing her state of mind to be reasonable.[29]

Expert testimony may be particularly appropriate when specialized areas of law, such as the insurance and financial matters relevant

---

[27]**United States v. Kelly**, 888 F.2d 732 (11th Cir. 1989).

[28]607 F.2d 92 (5th Cir. 1979) (*en banc*).

[29]607 F.2d at 98-99.

19

herein, are at issue.[30] In the case at bar, Daigle sought to present the testimony of a seasoned commercial lawyer that ostensibly would have supported his interpretation of the Chaparral and AMCC transactions, thereby bolstering his contention that he believed the assets to be acceptable. By disallowing that testimony the district court deprived Daigle of an opportunity to present critical evidence that he lacked fraudulent intent in assisting with the transactions. We underscore: Steeg's testimony would not be admissible for the purpose of proving what the law is; the declaration of controlling law must come from the court. Rather, it would be admissible as it relates to Daigle's understanding and resulting state of mind.

    4.   <u>Jury instructions</u>.

The jury instructions also undermined Daigle's good faith defense. We review a challenge to jury instructions to determine whether the instructions correctly state the law and cover the issues presented by the case.[31] In several respects the jury charge as given herein did not satisfy this standard, requiring reversal of the convictions of Daigle and Cavin.

    a.   Good faith.

The district court charged the jury that it "may" acquit the defendants if it found that they acted in good faith. A good faith

---

[30]<u>See</u> **Peckham v. Continental Cas. Ins. Co.**, 895 F.2d 830 (1st Cir. 1990).

[31]**United States v. Faulkner**, 17 F.3d 745 (5th Cir), <u>petition for cert. filed</u>, 63 USLW 3093 (July 27, 1994) (No. 94-171 and No. 94-5557-CFY) and (July 28, 1994) (No. 94-5417), and <u>cert</u>. <u>denied</u>, 115 S.Ct. 193 (1994).

defense is "the affirmative converse of the government's burden of proving . . . intent to commit a crime."[32] Acquittal is not optional upon a finding of good faith, as the court erroneously charged; it is mandatory because a finding of good faith precludes a finding of fraudulent intent. The implication of the charge as given was that the jury could convict without finding fraudulent intent.

> b. Deliberate ignorance.

The district court instructed the jury that deliberate ignorance sufficed to prove knowledge.[33] Daigle maintains that the evidence does not support such a charge. We do not agree. A deliberate ignorance instruction is appropriate where the evidence shows (1) subjective awareness of a high probability of the existence of illegal conduct, and (2) purposeful contrivance to avoid learning of the illegal conduct.[34] Daigle repeatedly invoked

---

[32]**United States v. Kimmel**, 777 F.2d 290, 293 (5th Cir. 1985), cert. denied, 476 U.S. 1104 (1986).

[33]The court instructed that:

The element of knowledge may be satisfied by inferences drawn from proof that a defendant deliberately closed his eyes to what otherwise would have been obvious to him. A finding beyond a reasonable doubt of a conscious purpose to avoid enlightenment would permit an inference of knowledge.

It is entirely up to you as to whether you find any deliberate closing of the eyes, and the inferences to be drawn from any such evidence. A showing of nothing more than negligence or mistake is not sufficient to support a finding of willfulness or knowledge.

[34]**United States v. Investment Enterprises, Inc.**, 10 F.3d 263 (5th Cir. 1993).

21

ignorance as a defense; he claimed that he did not know -- and did not inquire into -- critical details that rendered Ridgeway's transactions illegal. The court did not err in giving this charge as relates to Daigle. We conclude otherwise as relates to Cavin. The record is devoid of evidence of purposeful contrivance by Cavin to avoid learning the truth and the charge should not have been given as relates to him.

    c.   Attorney's duty of confidentiality.

Daigle contends that he was entitled to an instruction concerning an attorney's duty of confidentiality. The professional responsibilities of attorneys are relevant in instances as here presented, and a proper jury charge detailing those responsibilities should have been given.

    d.   Multiple conspiracies.

Finally, Daigle and Cavin object to the district court's failure to give a multiple conspiracy instruction. A multiple conspiracy charge instructs the jury to acquit if it finds that the defendant was not a member of the indicted conspiracy but rather was involved in another conspiracy. Upon request, a defendant is entitled to such an instruction if his theory of multiple conspiracies has a legal basis and is supported by sufficient evidence to raise a factual question for the jury.[35] Apart from the charged conspiracy to defraud the state regulators and the Alliance

---

[35]**United States v. Greer**, 939 F.2d 1076 (5th Cir. 1991), opinion modified on other grounds and reinstated in part by 968 F.2d 433 (5th Cir. 1992) (*en banc*), cert. denied, 113 S.Ct. 1390 (1993).

policyholders by inflating Alliance's assets, Daigle and Cavin contend that the evidence revealed a second conspiracy: a scheme by the principals of AMCC and stockbroker Peterson to defraud Alliance by misrepresenting that the FNMA securities securing the AMCC bond were unencumbered when in fact they were purchased on margin. That evidence did not entitle Daigle to a multiple conspiracy instruction because it did not implicate him in the uncharged conspiracy.[36]

Cavin, on the other hand, was entitled to a multiple conspiracy instruction. The jury could have found that Cavin knew that the FNMA securities were purchased on the margin and therefore participated in the uncharged conspiracy to defraud Alliance, but was not responsible for the manner in which the AMCC bond was reported on Alliance's financial statements and therefore did not participate in the charged conspiracy. In that event, absent a multiple conspiracy instruction, Cavin could have been convicted of a conspiracy with which he was not charged. As we held on analogous facts in **United States v. Stowell**,[37] the failure to give a multiple conspiracy instruction was reversible error.

---

[36]Cf. **Greer**, 939 F.2d at 1088 (a multiple conspiracy instruction is generally required where the indictment charges several defendants with one overall conspiracy, but the proof at trial indicates that a jury could reasonably conclude that some of the defendants were only involved in separate conspiracies unrelated to the overall conspiracy charge in the indictment); **United States v. Toro**, 840 F.2d 1221 (5th Cir. 1988) (multiple conspiracy instruction is not required where there was no serious doubt of the defendant's participation in the charged conspiracy).

[37]947 F.2d 1251 (5th Cir. 1991), on denial of petition for rehearing, 953 F.2d 188 (5th Cir.), cert. denied, 112 S.Ct. 1269 and 113 S.Ct. 292 (1992).

5.    Admission of evidence against Cavin.

Cavin contests the admission of three pieces of evidence. First, he challenges as hearsay certain testimony that the FNMA securities backing the AMCC bond were purchased on the margin. The error, if any, was harmless, for the next witness testified without objection to essentially the same matters. Second, Cavin characterizes as inadmissible hearsay a letter from Peterson to the principals of AMCC about the substitution of securities. He is incorrect. The document was offered not for the truth of the matters asserted but to establish a foundation for later showing that it was a forgery. The document was not hearsay and was properly admitted.[38] Third, Cavin challenges the admission under Fed.R.Evid. 404(b) of evidence of a prior stock rental transaction involving another insurance company. The district court properly found that the transaction was relevant to Cavin's intent but did not place on the record an assessment of its probative value compared to its prejudicial effect. On retrial the court should complete the balance of the Fed.R.Evid. 403 factors and spread its findings on the record.[39] Cavin further insists that the government should be required to inform the jury that he was acquitted of criminal charges in connection with the prior transaction. The government need do so only if there is evidence introduced that Cavin was charged.

---

[38]**Anderson v. United States**, 417 U.S. 211 (1974); **United States v. Adkins**, 741 F.2d 744 (5th Cir. 1984), cert. denied, 471 U.S. 1053 (1985).

[39]See **United States v. Elwood**, 993 F.2d 1146 (5th Cir. 1993).

6. <u>Severance</u>.

Cavin complains of the denial of his motion for severance. We perceive no error. Persons who are charged together generally should be tried together, particularly where they are charged with the same conspiracy. Severance is in order only when a defendant suffers compelling prejudice against which the trial court cannot protect.[40] Cavin was charged with the same conspiracy as his codefendants and the same evidence was involved. That he was involved with only one of the multiple transactions undertaken in the course of the conspiracy made it easy for the jury to compartmentalize the evidence against him. Through cautionary instructions the trial court minimized the possibility of spillover effect and the verdicts, convicting one defendant on counts of which another was acquitted and vise versa, reflect that the jury was able to follow those instructions. There was no abuse of discretion in the denial of severance.

## Conclusion

To summarize, we are not persuaded that, as a matter of law, the evidence is insufficient to support the convictions of Daigle and Cavin except as to counts 23 and 24 for Daigle and count 24 for Cavin. The convictions on those counts are REVERSED. In light of the above discussed erroneous evidentiary rulings and jury instructions, however, we VACATE the other convictions of Daigle and Cavin and REMAND for a new trial on the remaining counts, consistent herewith. Concluding that there is insufficient

---

[40]**United States v. McCord**, 33 F.3d 1434 (5th Cir. 1994).

25

evidence to sustain Seago's convictions we REVERSE same and REMAND for entry of a judgment of acquittal.