Obie D. **WASHINGTON**

v.

Edward M. **HARGETT, et al.**

No. 2:94–CV–300PS.

United States District Court,
S.D. Mississippi,
Hattiesburg Division.

June 22, 1995.

Obie D. Washington, Parchman, MS, pro se.

Jo Anne McFarland McLeod, Michael C. Moore, Mississippi Atty. General's Office, Jackson, MS, for Edward M. Hargett.

## *MEMORANDUM OPINION AND ORDER*

PICKERING, District Judge.

This cause was referred to the Magistrate Judge for Report and Recommendation and comes on this date to be heard upon the Report and Recommendation which was entered on April 12, 1995, and upon Petitioner's Objection to said Report and Recommendation. The Court having fully reviewed the Report and Recommendation as well as the Objection thereto and having reviewed the record, including the transcript of the original trial in state court, and being duly advised in the premises finds that the Report and Recommendation[1] should be accepted and adopted.

**1.** The Magistrate Judge's Report and Recommendation contains a well-written analysis of the applicable law. The Report and Recommendation also reaches the correct factual conclusion. However, in referring to the testimony of Larry Turner, a forensic serologist, the Report and Recommendation contains the following, "Turner testified that two types of sperm were found on the victim. The sperm found inside the victim's

vagina contained acid phosphatase, indicating that those sperm came from a person who secretes that enzyme. The sperm found on the outside of the victim's vagina did not contain this enzyme, indicating that those sperm came from a person who does not secrete acid phosphatase." The record reveals that Dr. Turner testified that persons are either secretors or non-secretors. He testified that a male secretor secretes ABH substances in his semen while a non-secretor does not secrete ABH substances in his seminal fluid. He went on to testify that the concentration of acid phosphatase found in seminal fluid is at a level of 20 to 40 times more than in red blood cells. Consequently, the presence or absence of ABH substances not acid phosphatase is what determines whether a male is a secretor or a non-secretor. This technical distinction, however, does not affect the factual conclusion

Plaintiff[2] strenuously objects to the Report and Recommendation of the Magistrate Judge. This Court will address Plaintiff's objections and the reasons that this Court does not find these objections persuasive. The Court would initially note that on a motion to dismiss under Rule 9(b) the record of the state court proceeding would not ordinarily be considered, but only the question of whether or not there is an "abuse of writ." Since the Plaintiff in this instance alleges factual innocence, it necessitates a review of the record of the proceeding in state court. Since Defendant filed its motion under Rule 9(b), Defendant did not attach the state court record and transcript with the motion, but the record and transcript was a part of the Court file as to the initial habeas proceeding filed in this Court, and this Court has reviewed said record including the transcript of the original trial.

Plaintiff was convicted of rape in August of 1982, some two months after the rape was alleged to have occurred. His conviction was affirmed by the Mississippi Supreme Court some three years later in October of 1985. On February 25, 1991, some five and one-half years after the state court affirmed his conviction, Plaintiff filed his first petition with this Court. Plaintiff's first petition for habeas corpus was dismissed in November of 1992. On May 17, 1995, more than two and one-half years later, he files this present and second action for habeas corpus.

Plaintiff in this case argues his "actual innocence." In the opinion of this Court, that is the only reason why this Court or any other federal court should be considering a petition for habeas corpus more than thirteen years after a crime is committed. There is no way that a fair trial could be conducted today. One need only review the transcript in this record and see the aggressive cross-examination that occurred only two months after this incident happened when the defense counsel was aggressively testing the recollection of the prosecuting witnesses, to see how a defense attorney could have a heyday cross-examining prosecution witnesses thirteen years after the incident as to how they could specifically remember that this or that did or did not happen thirteen years ago. Consequently, habeas should not lightly be granted. However, if Plaintiff has demonstrated his "probable innocence," he is entitled to issuance of the Great Writ. Cases involving allegations of actual innocence must be carefully considered.

Plaintiff objects to the Magistrate Judge's Report and Recommendation primarily on two grounds. First, he argues that according to the testimony of Larry Turner, a forensic serologist, who testified as an expert for the state, it would have been scientifically impossible for Plaintiff to have been the person who committed the rape on Annette Holmes. Secondly, he vigorously attacks the credibility of Annette Holmes' identification of him as the rapist.

The Court will first address Plaintiff's attack on the credibility of the victim's identification. Annette Holmes was a twenty-five year old woman who suffered from cerebral palsy. She wore a dental plate, because she had lost her upper teeth. She testified that she had never previously had sexual relations with anyone.

She testified that before her mother went to work at 6:30 a.m. on Saturday morning, June 5, 1982, that her mother woke her up so that she could do the wash and hang her clothes out to dry. While she was hanging her clothes out to dry around 7:30 a.m., she was approached by a man who asked her name. She did not know the name of the man, but she had seen him "lots of times." This man was the son of a neighbor of Annette Holmes. Annette Holmes testified that she told him her name and then went in the house and waited for several minutes hoping that the man would leave. After she thought he had left, she went back out to finish hanging out clothes. The man approached her from the rear, grabbed her around the neck, choked her, threatened to kill her, and carried her down a path behind her house

reached by the Magistrate Judge in the Report and Recommendation.

2. Obie D. Washington, Plaintiff herein, was the Defendant in the original criminal trial. This Court will refer to Mr. Washington throughout this opinion as Plaintiff.

and forcibly raped her. The testimony, without contradiction, establishes that she was beaten around the face and mouth and lost her dental plate during the encounter with the rapist. After the rape, Annette Holmes immediately began to scream and advised family members of what had occurred. She was immediately carried to the hospital. Family members testified they had never seen her so distraught. Plaintiff makes much of the fact that Holmes did not immediately tell her brother the Plaintiff's name. However, testimony is clear that she did immediately tell her brother that the rapist was "Bunny's husband's brother." (T. 88) Bunny was a neighbor of the victim and the wife of Rufus Washington, Plaintiff's brother, who testified for Plaintiff. Plaintiff now contends that Annette Holmes could have been mistaken in her identity and Rufus might have been the rapist.[3]

Plaintiff challenges Annette Holmes' statement that he told her who he was at the time of the rape arguing that it would be highly unlikely that he would have given his name to Annette Holmes while raping her. Annette Holmes testified, however, that Plaintiff asked her to meet him again saying, "I'll bring you a baby doll." (T. 79) If the jury believed this testimony of the victim Holmes, then the jury may well have believed that a rapist so arrogant as to believe that someone he had forcibly raped would like to meet him again for casual sex could also have been foolish enough to give the victim his name.[4]

Plaintiff attempts to describe his identification by victim Annette Holmes as being equivocal. Nothing could be further from the truth. Annette Holmes testified that she had seen the Plaintiff on numerous occasions and although she did not know his name and did not know the color of clothing he was wearing on the morning of the rape, she did positively identify him. She was vigorously cross examined about whether she could be mistaken in her identification of the Plaintiff.

At the time of the rape, the rapist had a long mustache. At the time of trial, Plaintiff had shaved his mustache. The victim admitted that the Plaintiff somewhat resembled the Plaintiff's brother who lived a few houses down from the victim. However, she was cross examined extensively as to whether or not this might be a case of mistaken identity. She was specifically asked if she could have mistaken the Plaintiff for his brother. She was asked if she realized the seriousness of her identification of the Plaintiff, and she testified that she did. On at least eight separate occasions, she positively without any equivocation identified the Plaintiff Obie D. Washington as her rapist. (T. 81, 83, 84, 85, 86 and 87) She never wavered in the least. It was obvious that there was no doubt in the mind of the victim that the defendant in the trial court, the Plaintiff before this Court, was her assailant.

The defense of Plaintiff was an alibi. He testified that the night before he had gone to a bar and disco in an adjoining county. He testified that he got two men whom he did not know to bring him back to Tylertown. He testified that they wanted to meet some girls in town and that at 1:00 a.m., looking for girls, he went to the door of Barbara Thompson (Fountain) who lives on the same street and just a few houses down from the victim's home. He testified that he left there right after 1:00 a.m. and then immediately went to his mother's house and went to bed and did not get up until the police arrived to arrest him. His mother's house is on the next street over and behind the home of the victim. His testimony was affirmed only by family members who testified that he came in and went to bed and to the best of their knowledge did not go out after that time. A police officer impeached the testimony of Plaintiff's mother testifying that when the police came to arrest Plaintiff at approximately 9:00 a.m. on the morning of the rape that his mother told the policeman that

---

3. This argument is contrary to Plaintiff's trial testimony. In response to a question about whether Rufus might have been the rapist, Plaintiff testified, "Mostly likely my brother don't do nothing like that, he been living by her all them years and I ain't never heard nothing like that going on." (T. 176)

4. This Court doesn't have the prerogative nor the responsibility of determining what the jury did or did not conclude. This Court simply has the responsibility to determine if a rational juror could have so concluded.

Plaintiff had only been in bed thirty to forty minutes. (T. 227, 229)

The witness Barbara Thompson (Fountain), whom Plaintiff admitted he woke up at 1:00 a.m., testified that he did not wake her up at 1:00 a.m. as the Plaintiff testified, but that he woke her up after 4:00 a.m. and that around 7:00 a.m. he was back on her doorsteps a second time. This witness was a former girlfriend of Plaintiff and had been at the same bar and disco in an adjoining county as had Plaintiff. She testified that she didn't even return home until after 4:00 a.m. Her testimony was corroborated by her sister who had stayed with Thompson's children the night before and by neighbors. At least five different witnesses other than the victim, disputed Plaintiff's alibi and established his presence on Cato street where the rape occurred at or about the time of the rape. Clearly, the jury believed the victim and the other witnesses and not the Plaintiff.

Plaintiff argues that the testimony of Larry Turner conclusively establishes that there was no penetration, and that Plaintiff is thus innocent.[5] This is a total mischaracterization of Turner's testimony. Turner's testimony does not support the conclusion reached by the Plaintiff. Turner testified that persons are classified as being secretors or non-secretors based upon whether or not they secrete ABH substances in their body fluids, including blood and semen. He testified that twenty percent (20%) of the population are non-secretors and that eighty percent (80%) are secretors. He testified that Plaintiff is a non-secretor and that the victim Annette Holmes is a secretor. He testified that both Holmes and the Plaintiff Obie D. Washington have blood Type O.

Turner testified he examined a slide containing substance taken from inside the victim's vagina. He testified that this slide and the swab from it contained not only sperm, but blood as well. He tested the blood and semen from inside the vagina at the same time. He did not test the semen and blood separately. This was the only sample that he had that was taken from inside her vagina and it was insufficient in quantity to allow for any further testing. He testified that as to this swab and slide "serological tests revealed the presences of ABH substance H, which is indicative of a person who is of O secretor status." (T. 125) Although Turner was never asked by the prosecution or the defense, it is obvious from his testimony as a whole that he concluded that the blood from Annette Holmes caused the slide with substance taken from within her vagina to test "indicative of a person who is of O secretor status." Turner clearly testified that his tests proved that a non-secretor such as Plaintiff was the rapist. Turner testified that he had this perception taking into consideration both the sample taken from within the vagina as well as the sample taken from outside the vagina.

As to the sperm that was found outside the vagina, he determined that this sperm came from a non-secretor. On cross-examination Turner was pressed to acknowledge that his findings were inconclusive. He disagreed with this characterization and stated that his findings did determine that sexual intercourse took place and that the "seminal fluid that was deposited on the vaginal slides and swabs and external swab was from a person who was determined to be a non-secretor." (T. 131) He testified explicitly that his tests *did not establish* that Obie D. Washington was the rapist, but that his tests did establish that Plaintiff was not excluded and that only twenty percent (20%) of the population are non-secretors and that Plaintiff is a part of that twenty percent (20%). He reiterated on two other occasions that "I can only say that the stains on the vaginal slides and swabs and external swab was from a person, well, a seminal fluid first, was from a person who was determined to be a non-secretor." (T. 133 and 134) As the Magistrate Judge's Report and Recommendation correctly points out, the state did not have to prove that sperm was present in the vagina, but only that there was penetration. Annette Holmes provided direct and positive testimony of penetration. The Plaintiff vigorously argues

---

5. In his present petition for habeas corpus, one of the grounds relied upon by Plaintiff is an attack upon the credibility of the testimony of Larry Turner. By this same testimony which he attacks as unreliable, he seeks to establish his innocence.

that Mr. Turner's testimony proves that he could not have committed the rape. Mr. Turner's testimony does not establish such a conclusion. To the contrary, on three separate occasions he testified that his tests established that the rapist was a non-secretor. His explicit testimony is in direct contradiction of the argument made by Plaintiff. Mr. Turner obviously concluded that as to the sample taken from inside the vagina of the victim that her blood accounted for the presence of the ABH substance H. The fact that Turner clearly stated that his tests did not pinpoint Plaintiff as the rapist is a clear indication that the jury convicted Plaintiff based on the testimony of the victim and the five witnesses who contradicted Plaintiff's alibi. Carefully considering, or completely disregarding, the testimony of Turner, there was ample evidence to support the jury verdict.

The anomaly of this case is that the Plaintiff is not presenting any new evidence as a grounds for habeas corpus. He is simply arguing evidence that has been in the record since the original trial at which he was convicted. This same evidence was considered by twelve jurors who unanimously found the Plaintiff guilty. It was considered by a state trial judge who is experienced and has a reputation for fairness. If the evidence did not support the conviction, which would include the essential element of penetration, it would have been the sworn duty of the trial judge not to have let the case go to the jury. This case was considered by the State Supreme Court and affirmed, although the argument now made before this Court was not the basis for the Supreme Court affirming the trial conviction. At trial, Plaintiff testified in his own behalf and thereby placed his credibility in issue. Since Plaintiff was tried as a recidivist, the indictment also alleged two previous felony convictions. On cross-examination, it was developed that the Plaintiff had not only been convicted twice previously, but had actually been convicted of three previous felonies.[6] Additionally, the record reveals that while the case was on

appeal to the Supreme Court, the Plaintiff escaped. Plaintiff's primary arguments before the State Supreme Court had to do with the questions about his prior convictions and the constitutionality of the enhanced penalty because Plaintiff is a recidivist.

The Plaintiff makes no argument that he is not barred from having this Court consider his present Petition for Writ of Habeas Corpus under the doctrine of abuse of writ, except for the narrow exception that applies to prevent a "manifest injustice"—that is to prevent the incarceration of one who is actually innocent. It is on this narrow exception that Plaintiff argues that he has produced a showing that would justify this Court considering this case on its merits. However, the law firmly establishes that the Plaintiff must make a "requisite showing by establishing that under the probative evidence he has a colorable claim of factual innocence." *Kuhlmann v. Wilson,* 477 U.S. 436, 454, 106 S.Ct. 2616, 2627, 91 L.Ed.2d 364 (1986). The *Kuhlmann* court quoted from Judge Friendly stating that " '[T]he prisoner must show a fair probability that ... the trier of fact would have entertained a reasonable doubt as to his guilt.' " *Id.* at 454, Note 17, 106 S.Ct. at 2627 note 17, (Citation omitted). The Fifth Circuit Court of Appeals in *U.S. v. Cavin,* 39 F.3d 1299, 1305 (5th Cir.1994), a case relied on by Plaintiff, has held that "in reviewing a sufficiency challenge ... we must view the evidence and all inferences therefrom in the light most favorable to the verdict and must affirm if a rational jury could have found that the government proved each element of the offense beyond a reasonable doubt." *Id.* at 1305. Although this Court is not presented with the question of the sufficiency of the evidence, nevertheless, this is the criteria that this Court must utilize in determining if the Plaintiff has made a probable showing.

Plaintiff's defense counsel was aggressive in filing protective motions and in conducting strenuous cross-examination. Plaintiff had a fair criminal trial. He was, and is, entitled to

6. During cross examination in an unresponsive answer Plaintiff spontaneously volunteered that he had previously been arrested for rape but that he was released because of insufficient evidence.

He gave this testimony as an explanation as to why the neighbors were all down on him and their testimony contradicted the testimony of Defendant and his family.

nothing more. He was not entitled to a perfect trial. No such trial can be held. Plaintiff states that he wants DNA testing now thirteen years later. He wants a new trial. A new trial, now, thirteen years later, would be much less reliable than the one that occurred thirteen years ago.

This Court concludes that the Plaintiff has not demonstrated a fair probability that the trier of fact would or should have entertained a reasonable doubt as to his guilt. In fact, this Court having reviewed the transcript of the original trial does not believe that any jurist can read the transcript and say that no "rational juror" could have found the Plaintiff guilty. Plaintiff has not demonstrated that he is entitled to relief. Accordingly, the Petition of the Plaintiff for a Writ of Habeas Corpus will be dismissed with prejudice.

SO ORDERED AND ADJUDGED.