**UNITED STATES of America,
Plaintiff,**

v.

**Thomas P. JASIN, Defendant.**

**Criminal Action No. 91–602–08.**

United States District Court,
E.D. Pennsylvania.

Sept. 15, 2003.

Robert E. Goldman, Robert A. Zauzmer, U.S. Attorney's Office, Philadelphia, PA, for Plaintiff.

Richard L. Scheff, Esquire, Montgomery, McCracken, Walker & Rhoads, LLP, Philadelphia, PA, Mark E. Haddad, Esquire, Sidley Austin Brown & Wood LLP, Los Angeles, CA, for Defendant.

## MEMORANDUM

DuBOIS, District Judge.

## TABLE OF CONTENTS

I. *INTRODUCTION* .................................................................673

II. *BACKGROUND* .................................................................674

III. *STANDARD OF REVIEW* .................................................676

IV. *SUMMARY OF THE COURT'S MEMORANDUM OF AUGUST 8, 2002* .........677
 A. TRIAL COUNSEL WAS OBJECTIVELY UNREASONABLE IN FAILING TO CALL AT TRIAL FIVE WITNESSES REQUESTED BY DEFENDANT WHO DEFENDANT ARGUED WOULD HAVE SUPPORTED HIS GOOD–FAITH BELIEF THAT HIS CONDUCT WAS LAWFUL .................................................................677

 B. TRIAL COUNSEL'S FAILURE TO INVESTIGATE, INTERVIEW AND CALL AT TRIAL TWO EXPERT WITNESSES AND THREE FACT WITNESSES PREJUDICED DEFENDANT ....................678

V. *DISCUSSION* .......................................................680
 A. THE GOVERNMENT'S CHALLENGES TO THE QUALIFICATIONS OF HIGGINS AND YATES AND THE ADMISSIBILITY OF THE OPINIONS STATED IN THEIR AFFIDAVITS ......................680
 1. *The Government Waived Any Opportunity to Challenge Higgins' and Yates' Expert Qualifications and the Admissibility of Their Opinions* ....................................................680
 2. *The Court's Reliance on Expert Testimony Concerning Applicable Law* ........................................................683
 (a.) Expert Testimony Concerning the Law Applicable to Importation of Defense Articles Is Admissible as it Relates to Defendant's State of Mind .........................................683
 (b.) The Government's Arguments Concerning Higgins' and Yates' Expert Qualifications and the Admissibility of Their Opinions Do Not Establish Clear Error or Manifest Injustice...............685
 (1.) *Expert Testimony under Daubert–Kumho Tire* ................685
 (2.) *Higgins' Qualifications and the Admissibility of His Proposed Testimony* .......................................686
 (i.) Higgins' Qualifications ...............................686
 (ii.) Admissibility of Higgins' Expert Opinions ................687
 (3.) *Yates' Qualifications and the Admissibility of His Proposed Testimony* ..............................................689
 (i.) Yates' Qualifications ................................689
 (ii.) Admissibility of Yates' Expert Opinions ..................690
 3. *The Government's Remaining Objections* .........................691
 (a.) Defendant Did Not Rely on Opinions.............................691
 (b.) Unavailability of Higgins at Trial .............................691
 4. *The ATF Opinion Letters Stating ATF Would Not Have Referred to Customs Service Practices in the Circumstances Presented* ............692
 B. THE GOVERNMENT'S CHALLENGES TO KERNS, GALLAGHER AND GUERIN .......................................................693
 1. *Kerns* ........................................................693
 (a.) Defendant Did Not Rely on Kerns ..............................693
 (b.) Defendant's Possession of the Sikorsky Memorandum ...............693
 (c.) Was the Sikorsky Memorandum Based on False Representations? .........................................694
 (d.) The Schmidt 302 and Zemetis 302 .............................694
 2. *Gallagher* ....................................................695
 (a.) Value–Added Theory.........................................695
 (b.) Gallagher's Proposed Testimony was Cumulative ..................695
 3. *Guerin* .......................................................696
 (a.) Speculation Regarding Guerin's Potential Testimony ...............696
 (b.) Guerin's Potentially Harmful Testimony .........................697
 (c.) Guerin's "Vague and Inadmissible Opinions" .....................697
 (d.) Strategic Decision Not to Call Guerin ...........................698
 (e.) Guerin's Credibility .........................................698
 (f.) Guerin's Proposed Testimony Was Cumulative ....................699

VI. *CONCLUSION* ....................................................699

## I. *INTRODUCTION*

This is a habeas corpus action filed under 28 U.S.C. § 2255 by defendant, Thomas P. Jasin ("Jasin" or "defendant"), which arises out of defendant's conspiracy conviction in a complex prosecution for violation

of the United States arms embargo against South Africa during the 1980s. By Memorandum and Order dated August 8, 2002, the Court granted in part defendant's habeas motion in part and vacated defendant's conviction. Presently before the Court is the Government's Motion for Reconsideration of the Court's Order Granting the Defendant's Motion Under 28 U.S.C. § 2255 ("motion for reconsideration"). For the reasons that follow, the government's motion for reconsideration is denied.

## II. *BACKGROUND*

The facts of this case are fully presented in several of the Court's previously reported opinions. *See, e.g., United States v. Jasin*, Crim. A. No. 91–602–08, 1993 WL 259436, at *1–11 (E.D.Pa. July 7, 1993) (factual history); *United States v. Jasin*, 215 F.Supp.2d 552, 555–57 (E.D.Pa.2002) (post-conviction history). The following factual and procedural history is sufficient for the purpose of addressing the government's motion for reconsideration. Relevant facts are restated where necessary throughout the discussion section of this Memorandum.

On January 23, 2001, defendant filed his Motion to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody under 28 U.S.C. § 2255 (" § 2255 motion"). In his § 2255 motion, defendant raised three arguments. The first and second arguments were based on claims of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)—that trial counsel was ineffective in his failure to (1) investigate, interview and call potential witnesses, and (2) object to the government's use at trial of defendant's statements made during proffer sessions with government representatives. In his third argument, defendant asserted that pre- and post-trial delay denied defendant's constitutional right to a speedy trial and

due process of law. Defendant withdrew the third argument by letter to the Court dated August 14, 2001, but reserved the right to re-raise it should the Court grant defendant a new trial.

On July 31, 2001, the Court conducted a telephone conference to discuss the need for an evidentiary hearing on the § 2255 motion. During the conference, the Court agreed with arguments by counsel that an evidentiary hearing was necessary on issues related to defendants' second claim for relief presented in the § 2255 motion— the claim that trial counsel was ineffective in failing to object at trial of defendant's statements made during proffer sessions with government representatives. Defense counsel also suggested that the witnesses trial counsel failed to interview or call at trial should testify at the hearing. The government took no position on that issue and the Court did not rule on it during the July 31, 2001 telephone conference.

By Order dated August 2, 2001, the Court scheduled an evidentiary hearing and oral argument on defendant's § 2255 motion for August 9, 2001. That same day, the Court by letter wrote to counsel to "clarify" the scope of the evidentiary hearing and oral argument. Specifically, the Court wrote that "I will expect a presentation of evidence on the issues we addressed in our telephone conference—the issue related to the use of evidence gathered during proffer sessions with Mr. Jasin and the related question of waiver by Mr. Jasin. *If any of you disagree, I direct that you advise me in writing by return mail so that we can determine the scope of the evidentiary hearing in advance of August 9th.*" (emphasis added).

Defense counsel responded to the Court's letter by letter to the Court dated August 3, 2001. In that letter, defense counsel argued that an evidentiary hearing

was warranted on all three issues raised in the § 2255 motion—the failure to investigate, the proffer agreement and the due process and speedy trial act violations. With respect to the first issue, the failure to investigate, defense counsel identified several witnesses—William Gallagher, John Kerns, James Guerin, Robert Yates, Vernon Acree, Stephen Higgins and Rex Davis—and stated that "... although there is no material dispute regarding the failure to investigate, there is a dispute regarding the impact of the witness' testimony at trial. For reasons stated in the 2255 Motion, an evidentiary hearing would provide the Court an opportunity to hear the witnesses and to judge their importance." Although some of those witnesses were not available to testify at the August 9, 2001 hearing, defense counsel asked the Court to proceed with the hearing, permit the testimony of the defense witnesses who were available to testify that day "... and make a ruling at that time as to what arrangements, if any, the Court will make to hear further testimony."

After receiving defense counsel's letter of August 3, 2001, the Court conducted a telephone conference with counsel that same date to discuss the scope of the evidentiary hearing. During that conference, the Court stated that it did not deem it necessary or appropriate to hear testimony from the witnesses identified in defense counsel's letter of August 3, 2001—witnesses who, according to defendant, should have been called at trial in support of his good-faith defense. The government agreed with the Court and the Court ruled that those witnesses would not be permitted to testify at the August 9, 2001 evidentiary hearing.

At the August 9, 2001 evidentiary hearing on the § 2255 motion, the Court confirmed with counsel that the scope of the hearing would be limited to testimony on the issues related to the proffer agree-ment. Counsel for the government agreed with the Court that testimony on other issues was not necessary—"It's our position that the Court has—*I assume it's the position also of both sides is that the Court has in the pleadings on the other issues the information that you need to make a decision.*" August 9, 2001, Evidentiary Hearing and Oral Argument Transcript ("Hr'g T.") at 18–19 (emphasis added). The parties then presented evidence on the question whether counsel's failure to object to the government's use at trial of defendant's statements made and documents produced during proffer sessions constituted constitutionally ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). At the conclusion of the presentation of that evidence, the Court heard argument.

By Memorandum and Order dated August 8, 2002, the Court granted in part and denied in part defendant's § 2255 motion. The Court granted defendant's motion on the first claim for relief—that trial counsel was objectively unreasonable in his failure to investigate, interview and call at trial witnesses with evidence in support of defendant's good-faith defense as requested by defendant and that this failure prejudiced defendant, and vacated defendant's conviction. The Court denied defendant's motion on the second claim for relief—that his trial counsel was ineffective for failing to object to the government's use at trial of defendant's statements made and documents produced during proffer sessions.

By Order dated August 15, 2002, the Court released defendant from custody and placed him on bail. That same day, the government advised the Court that it intended to seek reconsideration of the Court's decision to grant in part the § 2255 motion. The government thereafter filed its motion for reconsideration.

## III. *STANDARD OF REVIEW*

The government does not cite the procedural rule on which it relies in seeking reconsideration of the Court's Memorandum and Order dated August 8, 2002; the Court assumes, however, that the government is proceeding under Federal Rule of Civil Procedure 59(e). Under that Rule, a district court may alter or amend a judgment only if the party seeking reconsideration can demonstrate one of the following grounds: "... (1) an intervening change in the controlling law; (2) the availability of new evidence that was not available when the court ... [issued its previous decision]; or (3) the need to correct a clear error of law or fact or to prevent manifest injustice." *Max's Seafood Cafe ex rel. Lou Ann v. Quinteros,* 176 F.3d 669, 677 (3d Cir.1999) (citing *N. River Ins. Co. v. CIG-NA Reins. Co.,* 52 F.3d 1194, 1218 (3d Cir.1995)).

The government does not point to any intervening change in controlling law since the Court issued its August 8, 2002 Memorandum, and the Court concludes that there has been no such change. Thus, the first ground for a motion for reconsideration—an intervening change in controlling law—is inapplicable.

The government relies in its motion on four items of evidence that were not in the record when the Court ruled on defendant's § 2255 motion, thus implicating the newly discovered evidence prong of the three grounds for granting a motion for reconsideration. Specifically, the government attaches to its motion copies of two opinion letters drafted by Bureau of Alcohol, Tobacco and Firearms ("ATF") officials—a letter dated September 21, 1995 and a letter dated March 30, 1995, and two FBI witness statements, Form 302 ("302"), from Sikorsky employees Steve Schmidt and Joseph Zemetis. Gov't Mot. Ex. A, B, C. These exhibits are new evidence but the government does not contend that the evidence was newly discovered—not previously available.

■ "[W]hen evidence is not newly discovered, a party may not submit that evidence in support of a motion to reconsider...." *Pavlik v. Lane Ltd./Tobacco Exp. Int'l,* 135 F.3d 876, 882 n. 2 (3d Cir.1998) (citing *Harsco Corp. v. Zlotnicki,* 779 F.2d 906, 909 (3d Cir.1985)). Thus, the Court will not consider the new evidence presented by the government in deciding the motion.

■ The government states that "[t]he third circumstance applies here"—referring to the need to correct a clear error of law or prevent a manifest injustice. Gov't Mot. at 8 n. 4. " '[A]ny litigant considering bringing a motion to reconsider based upon ... [clear error and manifest injustice] should evaluate whether what may seem to be a clear error of law is in fact simply a disagreement between the Court and the litigant.' " *Reich v. Compton,* 834 F.Supp. 753, 755 (E.D.Pa. 1993) (citing *Dodge v. Susquehanna Univ.,* 796 F.Supp. 829, 830 (M.D.Pa.1992)); *see also Smith v. City of Chester,* 155 F.R.D. 95, 97 (E.D.Pa.1994) (same) (citing *Reich,* 834 F.Supp. at 755). A finding of clear error requires a " '... definite and firm conviction that a mistake has been committed.' " *Easley v. Cromartie,* 532 U.S. 234, 242, 121 S.Ct. 1452, 149 L.Ed.2d 430 (2001) (citing *United States v. U.S. Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948)). In order to show clear error or manifest injustice, the government must base its motion on arguments that were previously raised but were overlooked by the Court—"[p]arties are not free to relitigate issues that the Court has already decided." *Smith,* 155 F.R.D. at 97; *see also Glendon Energy Co. v. Borough of Glendon,* 836 F.Supp. 1109, 1122 (E.D.Pa.1993); *Rottmund v. Continental Assurance Co.,* 813 F.Supp. 1104, 1107 (E.D.Pa.1992). At

the same time, "[m]otions for reconsideration ... should not be used 'to put forward additional arguments which [the movant, in this case the government,] could have made but neglected to make before judgment.'" *Reich,* 834 F.Supp. at 755.

## IV. *SUMMARY OF THE COURT'S MEMORANDUM OF AUGUST 8, 2002*

Before analyzing the government's motion for reconsideration, the Court summarizes the grounds for granting defendant's § 2255 motion in part as set forth in the August 8, 2002 Memorandum. To establish a claim for ineffective assistance of counsel at trial under *Strickland,* a convicted defendant must demonstrate that his counsel's performance (1) "... fell below an objective standard of reasonableness," *id.* at 688, 104 S.Ct. 2052, and (2) that counsel's deficient performance prejudiced the defense. *Id.* at 693, 104 S.Ct. 2052. In the August 8, 2002 Memorandum, the Court granted defendant's § 2255 motion on defendant's first claim for relief—that trial counsel was objectively unreasonable under the framework established in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) in his failure to investigate, interview and call at trial witnesses requested by defendant who defendant argued would have supported his good-faith defense and that this failure prejudiced defendant.

The Court limits its exposition in this Memorandum to the issues of whether (1) trial counsel was objectively unreasonable in his failure to investigate, interview and call at trial witnesses with evidence in support of defendant's good-faith defense as requested by defendant and (2) trial counsel's failure to investigate, interview and call at trial two expert witnesses and three fact witnesses prejudiced defendant's good-faith defense.

## A. TRIAL COUNSEL WAS OBJECTIVELY UNREASONABLE IN FAILING TO CALL AT TRIAL FIVE WITNESSES REQUESTED BY DEFENDANT WHO DEFENDANT ARGUED WOULD HAVE SUPPORTED HIS GOOD–FAITH BELIEF THAT HIS CONDUCT WAS LAWFUL

In determining that trial counsel's failure to investigate, interview and call at trial witnesses with evidence in support of defendant's good-faith defense fell below an objective standard of reasonableness under the first prong of *Strickland,* the Court, in the Memorandum, first summarized the relevant evidence presented at trial. At trial, the government sought to prove, *inter alia,* that defendant was involved in three different prongs of a conspiracy to violate the Arms Export Control Act ("AECA"), 22 U.S.C. §§ 2778(b)(2) and 2778(c) and its implementing regulations, 22 C.F.R. § 121 *et seq.* and the Comprehensive Anti–Apartheid Act of 1986 ("CAAA"), 22 U.S.C. § 5001 *et seq.* The three prongs of the conspiracy were "... (1) the illegal importing of surrogate missile components from South Africa to the United States, (2) the illegal exporting of United States missile components to South Africa for integration into South African missiles, and (3) the illegal transfer to South Africa of technical data derived from United States-based testing of missiles originally produced in South Africa." *Jasin,* 215 F.Supp.2d at 560.

Defendant asserted a good faith defense to all three prongs of the charged conspiracy. He sought to prove—and he argued to the jury—that he held an honest belief that he was acting in compliance with the law. It was defendant's position that he lacked the willful state of mind required to establish a violation of the relevant law. The Court charged the jury on the law

applicable to this defense, explaining that defendant's good faith was a " '... complete defense ... because good faith on the part of the defendant is simply inconsistent with the intent to commit the crime charged.' " *Id.* (quoting Trial Transcript ("T."), Dec. 4, 1992, at 100; App. at 3496).[1]

The Court then addressed defendant's claim that trial counsel was ineffective because he "... inexplicably failed to interview and call a number of fact witnesses defendant told him would provide testimony helpful to his defense, and he likewise failed to seek out expert witnesses requested by defendant." *Id.* at 558. The Court noted that the government presented no contrary evidence—the government produced no affidavit from trial counsel explaining his strategic decision-making process and "... expressly declined to call trial counsel at the August 9, 2001, evidentiary hearing...." *Id.* at 564. Based on the uncontested evidence, the Court concluded "... that trial counsel conducted no pre-trial investigation and interviewed neither the witnesses defendant asked him to interview nor the witnesses he actually presented." *Id.* at 566. The Court then applied *United States v. Gray*, 878 F.2d 702, 711 (3d Cir.1989), which held that "[i]neffectiveness is generally clear in the context of complete failure to investigate because counsel can hardly be said to have made a strategic choice against pursuing a certain line of investigation when s/he has not yet obtained the facts on which such a decision could be made." Based on the affidavits submitted by defendant in which the proposed testimony of each witness was summarized, the Court ruled that *Gray* compelled the conclusion that trial counsel's failure to contact five witnesses defendant said would support his good-faith belief defense constituted a clear instance of ineffectiveness and satisfied the first prong of *Strickland* with respect to that claim. *Jasin*, 215 F.Supp.2d at 566.

## B. TRIAL COUNSEL'S FAILURE TO INVESTIGATE, INTERVIEW AND CALL AT TRIAL TWO EXPERT WITNESSES AND THREE FACT WITNESSES PREJUDICED DEFENDANT

In the Memorandum, the Court next examined the evidence that defendant presented on the second prong of *Strickland*—that is, whether trial counsel's failure to investigate, interview and call at trial two expert witnesses and three fact witnesses prejudiced defendant. The Court concluded that the evidence supported defendant's claim of prejudice. That conclusion was limited to two prongs of the conspiracy: the imports and exports prongs.

The imports prong of the conspiracy involved charges that defendant and defendant's employer, International Signal and Control Corporation ("ISC"), illegally imported into the United States South African surrogate missiles, or missile dummies,[2] as part of ISC's Striker missile program. A central issue with respect to this prong of the conspiracy was the classification of the missile dummies' country of origin. Under the regulations governing

---

1. In their filings concerning the § 2255 motion and the motion for reconsideration, the parties cite to the record by referring to the trial transcripts and to the Appendix ("App.") to defendant's direct appeal. Because that appendix was never docketed with the Clerk of this Court, the Court will supply in this Memorandum parallel citations to the original trial transcripts and the Appendix.

2. The conspiracy did not involve the importing of fully operational missiles armed with warheads. Rather, it involved missile dummies, which are missile bodies weighed and balanced to simulate an operational missile. International Signal and Control Corporation ("ISC") sought to import the missile dummies to test them for flight irregularities.

importation of defense articles, anyone seeking to import defense articles was required to complete an ATF application form which, *inter alia*, asked the applicant to identify the country of origin.[3] At the relevant time period, a United States embargo prohibited the importation of defense articles that were classified as originating in South Africa. At trial, the government adduced evidence that the missile dummies ISC imported were South African in origin.

Defendant testified at trial that he had a good-faith belief that, under the governing ATF regulations, the imported missile dummies were properly classified as Italian in origin. That statement was based on evidence that the South African missile manufacturer shipped incomplete missile dummies to Italy, where an Italian company, Elmer Industrie per lo Spazio e le Comunicazoni S.p.A. ("Elmer"), added components in assembling the missile dummies that were ultimately imported into the United States. Because Elmer added components, and, thus, financial value to the missile dummies, defendant argued that under a "value added" theory, the proper country of origin for the missile dummies was Italy.

With respect to the imports prong of the conspiracy, the Court found prejudice in defense counsel's failure to follow up on defendant's request to locate and present at trial an ATF expert and a United States government military missile expert. That ruling was based on the affidavits of Stephen Higgins, a former director of ATF, and Robert Yates, a military missile expert. The Court concluded those affidavits established that, had trial counsel investigated such experts or had he found expert witnesses like Higgins and Yates, those witnesses would have presented evidence which supported the reasonableness of defendant's good-faith belief that the importation of Striker missile dummies was lawful under a value-added theory— that because of the value added to the missile dummies in Italy, it was proper to identify Italy as the country of origin. The Court also found prejudice in trial counsel's failure to interview John Kerns and William Gallagher, representatives of the Sikorsky Aircraft Division of United Technologies Corporation ("Sikorsky") who worked with defendant.[4] On the basis of their affidavits, the Court ruled that Kerns and Gallagher would have provided evidence supportive of defendant's subjective good-faith belief.

The exports prong of the conspiracy involved charges that defendant was part of the ISC conspiracy to illegally export components, including batteries and xenon bulbs, to South Africa for integration into South African missile surrogates. Defendant's defense with respect to this prong of the conspiracy was that his superior at ISC, James Guerin,[5] the founder and majority shareholder of ISC and the leader of the ISC conspiracy, told defendant that ISC had "Washington approval" for the export program.

With respect to the exports prong of the conspiracy, the Court found prejudice in trial counsel's failure to interview Guerin and call him as a witness at trial. After analyzing the record evidence, the Court concluded that Guerin would have offered evidence on defendant's good-faith belief

---

**3.** Testimony at trial established that the rules governing importation of operational missiles applied in the same manner to missile dummies.

**4.** The Sikorsky Aircraft Division of United Technologies Corporation had agreed to work

with ISC of the testing of the imported missile dummies.

**5.** Guerin, who was named in a separate Indictment from that naming defendant, pled guilty to the charges against him and was sentenced to, *inter alia*, fifteen years in prison.

that ISC was exporting missile components with government approval. The Court further concluded that Guerin's testimony would have called into doubt defendant's involvement in any illegal activity.

## V. DISCUSSION

In its motion for reconsideration, the government accepts "... as accurate ... the Court's conclusion that trial counsel was ineffective in failing to locate or present ..." the witnesses discussed in the Court's Memorandum. Gov't Mot. at 1. Thus, there is no need for the Court to address its ruling that trial counsel was ineffective under *United States v. Gray.*

The government, however, takes issue with the Court's ruling that trial counsel's failure to investigate, interview and call two expert witnesses—Higgins and Yates—and three fact witnesses—Kerns, Gallagher and Guerin—prejudiced defendant. The government argues that the Court committed clear error in ruling that four witnesses—Higgins, Yates, Kerns and Gallagher—would have been allowed to testify at trial. The government also contends that the Court committed clear error in "... suppl[ying] speculation as to what ..." Guerin's testimony would be "... without any proffer from the defense." Gov't Mot. at 2. The Court will consider these arguments seriatim.

### A. THE GOVERNMENT'S CHALLENGES TO THE QUALIFICATIONS OF HIGGINS AND YATES AND THE ADMISSIBILITY OF THE OPINIONS STATED IN THEIR AFFIDAVITS

1. *The Government Waived Any Opportunity to Challenge Higgins' and Yates' Expert Qualifications and the Admissibility of Their Opinions*

■ The government argues that the Court committed clear error without first

having made threshold determinations that Higgins and Yates were qualified as expert witnesses whose testimony would be admissible under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). It is the government's position that "... the Court must conduct a *Daubert* inquiry, and in that inquiry the government will show ..." that Higgins and Yates are not qualified experts and that their opinions hold no support in the relevant community. The government also contends that these objections were preserved—it argues that it "... repeatedly stated its view that the proffered witness testimony was inadmissible on various grounds and that therefore prejudice cannot be established." Gov't Mot. at 6–7 (footnote omitted). In making these arguments, the government concedes, as it must, that it never requested a *Daubert* hearing or objected to the proffered expert testimony under *Daubert.* Gov't Mot. at 7 ("The government may not have cited *Daubert* by name....").

■ The Court rejects the government's argument that the Court had an obligation, *sua sponte*, to conduct a *Daubert* inquiry. "[T]he trial judge is assigned the task of insuring that an expert's testimony rests on a reliable foundation and is relevant, but *Daubert* does not mandate an inquiry questioning and challenging the scientific proffer absent a timely request by an objecting party." *Macsenti v. Becker*, 237 F.3d 1223, 1232 (10th Cir.2001); *see also United States v. Evans*, 272 F.3d 1069, 1094 (8th Cir.2001) ("There is no requirement that the District Court always hold a *Daubert* hearing prior to qualifying an expert witness under Federal Rule of Evidence 702...."). On that issue, the First Circuit, in *Hoult v. Hoult*, 57 F.3d 1 (1st

Cir.1995), stated "[w]e do not think, however, that district courts are required, *sua sponte*, to make explicit on-the-record rulings regarding the admissibility of expert testimony." *Id.* at 4–5. The Court agrees with the *Hoult* court—absent a request from the parties, a district court has no obligation to make explicit on-the-record rulings concerning *Daubert* issues.

The Court also rejects the government's belated request for a *Daubert* inquiry because the government waived those challenges as well as an opportunity to request a hearing on those matters. A review of the record discloses that not only did the government fail to request such a hearing before the Court ruled on defendant's § 2255 motion, it also agreed that it did not need an opportunity to examine the witnesses it now seeks to challenge.

As explained in more detail in § I of this Memorandum, *supra,* after defendant's § 2255 motion was fully briefed, the Court convened a telephone conference with defense and government counsel on July 31, 2001 to discuss the need for an evidentiary hearing and the scope of that hearing. Specifically, at the July 31, 2001 telephone conference, the Court agreed with the arguments of defense counsel and the government that an evidentiary hearing was necessary only on issues related to defendants' second claim for relief—the claim that trial counsel was ineffective in failing to object at trial to the use during cross examination of defendant's statements made during proffer sessions with government representatives.

After the Court scheduled an evidentiary hearing and oral argument by Order dated August 2, 2001, defense counsel wrote to the Court by letter dated August 3, 2001, arguing that the scope of the hearing should be expanded to include testimony from witnesses presented on defendant's first claim for relief—the claim that trial counsel was ineffective in failing to investigate, interview and call at trial witnesses who defendant argued would have supported his good-faith defense. The letter identified the witnesses, summarized their proposed testimony and named those witnesses who would be available to testify at the August 9, 2001 evidentiary hearing and those who would not be available to testify. That same day, after receiving that letter, the Court convened a telephone conference with defense counsel and government counsel. At the conference, the Court stated that it did not deem it necessary or appropriate to hear testimony from witnesses who, according to defendant, would have supported his good-faith belief that his conduct was lawful. The government agreed with the Court's determination. Thus, the Court ruled that such testimony would not be permitted at the August 9, 2001 evidentiary hearing.

Then, at the August 9, 2001 evidentiary hearing, the Court confirmed its understanding of the scope of the hearing with defense and government counsel—that live testimony was not necessary on the value-added witnesses. That understanding is evidenced by the following colloquy between the Court and counsel:

THE COURT: There's one other issue that occurred to me when I started reviewing all the papers after we spoke and that is, customarily in a case like this where witnesses are not called, although we do not hear from the witnesses, we rely on the affidavits or the submissions of the witnesses, unless they're contested, and *the Government in this case when we spoke about scheduling this hearing reported that they were not contesting what it was the defense said the witnesses identified in the motion papers would say if they had been called.*

MR. GOLDMAN: We were talking about the value-added witnesses at that point, your Honor.

THE COURT: I think *we were talking about the need to call any witnesses,* Mr. Haddad mentioned some by name and I didn't immediately associate them with value-added or any other issue. . . . Did I mislead you, Mr. Goldman and Mr. Haddad, into thinking—

MR. GOLDMAN [for the government]: Oh, not at all.

THE COURT:—that you could not call [trial counsel]?

MR. GOLDMAN: Absolutely not, your Honor, we both know we could call [trial counsel]. I—frankly, I guess [trial counsel] is one of those witnesses that neither side wants to call. And the Government's position is that [trial counsel] explained his trial strategy at the suppression motion and, that being, I raised a legal issue, I consulted with Mr. Martin, prior counsel, on the issue, Mr. Martin has confirmed the Government's position in its pleadings and, based upon that, I'm withdrawing the motion to suppress the proffer statements.

THE COURT: All right. *Now, that's limited to the motion to suppress and what I'm talking about transcends that, goes beyond that, what I'm talking about is calling—*

MR. GOLDMAN: *All the issues?*

THE COURT: *Yes. Now, did I mislead you in that regard?*

MR. GOLDMAN: *Not at all, your Honor. It's our position that the Court has—I assume it's the position also of both sides is that the Court has in the pleadings on the other issues the information that you need to make a decision.*

THE COURT: All right.

Hr'g T. at 13–19 (emphasis added). In the August 8, 2002 Memorandum, this Court concluded that "[t]his colloquy makes it abundantly clear that, on the question of counsel's trial strategy, the government is relying solely on the written submissions." *Jasin*, 215 F.Supp.2d at 565. This colloquy also makes it clear that the government consciously chose not to challenge on *Daubert* grounds the admissibility of the testimony of the witnesses whose affidavits were presented in support of defendant's first claim for relief.

The government's position was reaffirmed in another colloquy that took place later in the hearing:

MR. HADDAD: . . . Now, *Mr. Yates was one of the witnesses who was prepared, as your Honor knows, to fly here and be here today if your Honor wanted testimony on this.* The Government has said it doesn't think it needs testimony here. In a footnote they have said that this is a false affidavit or, you know, other things, but we were prepared to present him. We think given the posture of this—

THE COURT: *The Government has taken the position that they're not challenging what is set forth in those affidavits.*

MR. HADDAD: Exactly. So I think that you have to disregard, you know, what they've sort of thrown away in the footnotes of their brief and look at this affidavit for what it is. . . .

*Id.* at 290 (emphasis added). That exchange took place without any objection from the government and confirms that the defense offered to produce Yates and other witnesses at the hearing but that the government said it was not necessary to do so.

In addition to the government's failure to object to defense counsel's statements at the August 9, 2001 hearing, the government stated at the conclusion of argument that it was prepared to " . . . *rely unless the Court has questions on our reply*

*memorandum and our surreply memorandum.*" *Id.* at 234 (emphasis added). Those documents say nothing about Higgins' or Yates' qualifications or any other *Daubert* issues. Thus, the Court concludes the government waived all such objections.

### 2. The Court's Reliance on Expert Testimony Concerning Applicable Law Did Not Constitute Clear Error or Manifest Injustice

Notwithstanding the Court's ruling on waiver, the Court will address the government's belated challenges to its reliance on the proffered expert testimony in determining whether reconsideration is required to correct a clear error of law or prevent manifest injustice.

### (a.) Expert Testimony Concerning the Law Applicable to Importation of Defense Articles Is Admissible as it Relates to Defendant's State of Mind

■ As a threshold matter, the government argues that "... the testimony of an expert [is not] relevant to establish that a defendant's state of mind was reasonable because this so-called expert witness had a similar belief. Testimony that addresses the reasonableness of a defendant's belief concerning a regulation calls for a legal conclusion. As such, it is an inappropriate matter for expert testimony." Gov't Mot. at 23.

In the August 8, 2002 Memorandum, the Court ruled that "... notwithstanding the government's argument that Higgins' affidavit is incorrect as a matter of law, Higgins' testimony on this issue would have been admissible at trial." *Jasin,* 215 F.Supp.2d at 570. That ruling was based on the Court's conclusion that "Higgins'

affidavit, particularly in its reference to the absence of ATF rules on country of origin, shows that reasonable professionals experienced with ATF regulations could disagree about the governing law." *Id.* Use of expert evidence in that manner was sanctioned, the Court noted, by the Fifth Circuit's ruling in *United States v. Cavin,* 39 F.3d 1299 (5th Cir.1994). In *Cavin,* the court reversed a conviction of a lawyer for participating in fraudulent securities transactions of a client on the ground that the trial court improperly excluded expert testimony as to the law governing the transactions. The Court noted that "[t]he import of *Cavin* in this case is that an expert's testimony concerning the state of the law as to importation of defense articles is admissible as it relates to the defendant's 'understanding and resulting state of mind.'" *Jasin,* 215 F.Supp.2d at 570 (citing *Cavin,* 39 F.3d at 1309).

The Court observed in the August 8, 2002 Memorandum that the government did not challenge *Cavin* in its several opportunities to brief the issue. *Id.* at 570 n. 16. Nevertheless, the Court analyzed both *Cavin* and the decision on which the *Cavin* court relied—*United States v. Garber,* 607 F.2d 92 (5th Cir.1979) (en banc). *Garber* reversed a tax evasion conviction because, in the court's judgment, the trial court improperly excluded expert testimony on the question of whether income derived form the sale of a taxpayer's blood was taxable.

After noting that a number of courts had criticized the Fifth Circuit's ruling in *Garber,*[6] the Court stated in the August 8, 2002 Memorandum that "[o]ne of the essential problems with *Garber* ... is that the analysis would permit 'juries to find that uncertainty in the law negates willful-

---

6. *See Jasin,* 215 F.Supp.2d at 570 n. 16 (citing *United States v. Harris,* 942 F.2d 1125, 1132 n. 6 (7th Cir.1991); *United States v. Curtis,*

782 F.2d 593, 599 (6th Cir.1986); *United States v. Ingredient Tech. Corp.,* 698 F.2d 88, 96–97 (2d Cir.1983)).

ness whether or not the defendants are actually confused about the extent of their tax liability.' " *Id.* (citing *Ingredient Tech. Corp.*, 698 F.2d at 97). The Court agreed with that criticism of *Garber* but noted that " . . . the *Cavin* decision addressed the problem by admitting expert testimony 'only as it relates to [the defendant's] understanding and resulting state of mind.' " *Id.* (citing *Cavin*, 39 F.3d at 1309).[7]

In its belated challenge to the Court's reliance on *Cavin*, the government cites three cases, *United States v. Scholl*, 166 F.3d 964 (9th Cir.1999), *United States v. Hook*, 195 F.3d 299 (7th Cir.1999) and *United States v. Herzog*, 632 F.2d 469 (5th Cir.1980). Those cases are inapposite.

In *Scholl*, the Ninth Circuit affirmed a conviction of a compulsive gambler for filing false tax returns and structuring currency transactions. In affirming that conviction, the Ninth Circuit held that the district court properly excluded expert testimony that " . . . compulsive gamblers do not want to keep records because that would force them to confront the reality of [their] losses . . . . " *Scholl*, 166 F.3d at 970. In so ruling the Ninth Circuit emphasized the fact that the expert acknowledged there was no support in the literature for his opinion that pathological gamblers cannot truthfully report gambling income.

In *Hook*, the defendant in a prosecution for, *inter alia*, theft from an employee benefit plan under ERISA, appealed his conviction on the ground that the district court improperly excluded expert testimony that the employee benefit plan at issue

" . . . was no longer an ERISA plan since the employees were no longer employees within the meaning of ERISA . . . " as a result of the closure of a manufacturing plant. That testimony was offered in support of the defendant's argument that the plan was not subject to ERISA. In affirming defendant's conviction on that count, the court ruled that " . . . the district court correctly ruled that this opinion was inaccurate as a matter of law." *Hook*, 195 F.3d at 309.

In *Herzog*, the defendant in a tax prosecution sought at trial to introduce expert testimony in support of his defense that he did not act wilfully because he thought, albeit erroneously, that his wages were exempt from taxation. Specifically, defendant's expert sought to testify that the tax laws themselves were complex and that " . . . even law students, law professors, and attorneys find the subject very difficult." *Herzog*, 632 F.2d at 473 (citation omitted). The Fifth Circuit held that the district court did not err in excluding the testimony because the expert opinion was not relevant to the willfulness issue—the opinion " . . . could not shed any light on whether *Herzog* had been confused by any such complexity at the time . . . " he committed the criminal conduct. *Id.* (emphasis in original).

This case is different from those relied on by the government. The Higgins affidavit does not offer an opinion regarding the reasonableness of defendant's beliefs. Nor does it offer an opinion that the law

---

7. The Court notes that there is additional authority for the proposition that expert testimony may be appropriate when specialized areas of law are at issue. In *United States v. Lankford*, 955 F.2d 1545 (11th Cir.1992) the defendant's conviction for, *inter alia,* filing false income tax returns, was reversed on the ground that the trial court had improperly excluded expert testimony concerning the reasonableness of the defendant's conclusion that

a $1500.00 check he received while running for Sheriff, which bore no notation that it was for campaign purposes, was a gift rather than taxable income. "Any evidence concerning the reasonableness of Lankford's belief that the $1500 he received was a gift rather than taxable income is relevant to the determination of whether Lankford willfully violated the tax laws." *Id.* at 1550.

governing the import of defense articles is confusing or complex. Rather, Higgins' proposed testimony would have supported the reasonableness of defendant's good faith belief that the importation of Striker missile dummies was lawful under a value-added theory. Such expert testimony would have been admissible as it relates to defendant's "... understanding and resulting state of mind." *Cavin*, 39 F.3d at 1309.

Separate and apart from *Cavin* and similar cases, the Court ruled in the August 8, 2002 Memorandum that it "... would have admitted testimony of the sort presented in Higgins' affidavit in rebuttal because the government presented testimony on the same issue through its own expert witness, Pearl Baylor, an import specialist with the ATF." *Id.* at 571. Baylor testified at trial that an application for the importation of arms would have been denied if it listed the country of origin as South Africa. *Id.* (citing T., Nov. 13, 1992, at 19; App. at 845). According to Baylor, if the items in the application were transferred to a country where value was added, ATF would look to the "originating point" to determine the item's country of origin. *Id.* (citing T., Nov. 13, 1992, at 20; App. at 846). The Court noted that "[d]efendant certainly would have been entitled to rebut that testimony by presenting an expert witness prepared to testify to the contrary." *Id.* "[B]ecause of counsel's ineffectiveness, the jury never heard Higgins' testimony or any other defense testimony from the ATF—to defendant's prejudice." *Id.*

Thus, the Court rejects the government's argument relating to the admissibility of expert opinions on the law applicable to importation of defense articles. Reconsideration of the ruling that such testimony is admissible on the issue of defendant's state of mind is not required to correct a clear error of law or prevent manifest injustice.

**(b.) The Government's Arguments Concerning Higgins' and Yates' Expert Qualifications and the Admissibility of Their Opinions Do Not Establish Clear Error or Manifest Injustice**

The main thrust of the § 2255 Motion is that the expert testimony is admissible on the issue of defendant's state of mind and this Court so ruled in its Memorandum and Order dated August 8, 2002. However, the Court, in reviewing the record in connection with the motion for reconsideration, concludes that the expert testimony is admissible on another ground as well—the question whether the value added resulted in a substantial transformation of the missile dummies sufficient to make Italy the country of origin. The Court will next address the government's arguments concerning Higgins' and Yates' qualifications as experts and the admissibility of their opinions on both issues.

**(1.) *Expert Testimony under Daubert–Kumho Tire***

Federal Rule of Evidence 702 provides as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

■ Under Rule 702, when "[f]aced with a proffer of expert scientific testimony ...

the trial judge must determine at the outset, pursuant to Rule 104(a), whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) (footnotes omitted). It is well settled that the gatekeeping role established in *Daubert* under Rule 702 is not limited to scientific testimony—the *Daubert* approach applies to all cases where the "... testimony reflects scientific, technical, or other specialized knowledge." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). This approach helps to ensure the reliability of expert testimony, which "... can be both powerful and quite misleading because of the difficulty in evaluating it." *Daubert*, 509 U.S. at 595, 113 S.Ct. 2786 (quoting Jack B. Weinstein, Rule 702 of the Federal Rules of Evidence is Sound; It Should Not Be Amended, 138 F.R.D. 631, 632 (1991)).

 Under *Daubert*, the Court must engage in a two-step inquiry. "First of all, the proffered 'expert' must be qualified to express an expert opinion.... Secondly, the proffered expert opinion must be reliable." *In re TMI Litig.*, 193 F.3d 613, 663 (3d Cir.1999). With respect to this inquiry, a number of criteria to guide the courts in making reliability determinations have been identified, including:

(1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to he reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judi-cial uses to which the method has been put.

*Elcock v. Kmart Corp.*, 233 F.3d 734, 745–46 (3d Cir.2000) (quoting *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 742 n. 8 (3d Cir.1994)). This list is not exhaustive—the inquiry under *Daubert* should remain a flexible one. *See, e.g., Elcock*, 233 F.3d at 746 (noting that "*Kumho Tire* makes clear that this list is non-exclusive and that each factor need not be applied in every case"). As a general rule, the party offering the expert testimony has the burden of establishing its admissibility by a preponderance of the evidence. *See Padillas v. Stork–Gamco, Inc.*, 186 F.3d 412, 418 (3d Cir.1999). Based on the following analysis, the Court concludes there is sufficient evidence in the record to meet that standard with respect to Higgins and Yates.

### (2.) *Higgins' Qualifications and the Admissibility of His Proposed Testimony*

### (i.) Higgins' Qualifications

 The government argues that Higgins is not qualified to opine on the law governing the importing of defense articles. Gov't Mot. at 8, 10. The Court rejects that argument. An expert witness may be qualified to testify on the basis of "... knowledge, skill, experience, training or education. Any one of them is alone sufficient." *Dychalo v. Copperloy Corp.*, 78 F.R.D. 146, 149 (E.D.Pa.), *aff'd*, 588 F.2d 820 (3d Cir.1978). Higgins states in his affidavit that he "... is the former Director of the Bureau of Alcohol, Tobacco, and Firearms, serving in that position from 1982 until retirement in 1993, after approximately 32 1/2 years in ATF." Aff. of Stephen E. Higgins, Def.'s Ex. 2 to § 2255 Motion ("Higgins Aff.") ¶ 1. "As Director of ATF, I was responsible among other duties for the issuance of permits and licenses covering the importation of

firearms, ammunition, defense articles, and similar items...." *Id.* ¶ 2.

It is the position of the government that Higgins is unqualified to opine on the law governing the import of defense articles because he did not deal with "... day-to-day determinations of the lawfulness concerning the import of defense articles." Gov't Mot. at 16 n. 9. The Court disagrees. The fact that Higgins was not involved in the day-to-day determinations of ATF presents a credibility issue that would have been for the jury to resolve. In cases involving specialized areas of criminal law, such as illegal drugs, gangs, arson prosecutions, money laundering, organized crime and forgery, law enforcement officers are often qualified as experts based solely on their general experience. *See, e.g., United States v. Watson,* 260 F.3d 301, 307–08 (3d Cir.2001) (drugs); *United States v. Hankey,* 203 F.3d 1160, 1168 (9th Cir.2000) (gangs); *United States v. Marler,* 614 F.2d 47, 49 (5th Cir.1980); *United States v. Majors,* 196 F.3d 1206 (11th Cir. 1999) (money laundering); *United States v. Locascio,* 6 F.3d 924, 937 (2d Cir.1993) (organized crime); *United States v. Chappell,* 6 F.3d 1095, 1100 (5th Cir.1993) (forgery). Based on this authority, the Court determines that a former director of ATF with 32 1/2 years of experience in that agency, with eleven years at the agency's helm, would be qualified to testify as an expert concerning ATF regulations and practice applicable to the importation of defense articles.

### (ii.) Admissibility of Higgins' Expert Opinions

Having determined that Higgins would qualify as an expert on ATF rules and regulations concerning the classification of country of origin of armaments, the Court next turns to the government's challenges to the admissibility of his opinions, specifically the government's arguments that Higgins' opinions are legally incorrect or inapplicable in that they conflict with the Court's prior ruling that the value-added theory was not the law of the case. Gov't Mot. at 16–18.

Higgins' affidavit states that the ATF would have considered the value added concept in the same manner as set forth in the affidavit of Vernon Acree, who had been Commissioner of Customs for five years.[8] Specifically, Higgins says "... where there is a question with respect to the proper classification or categorization of items to be imported ... ATF would look to U.S. Customs for guidance when the terms in question are not specifically defined in ATF laws or regulations." Higgins Aff. ¶ 6. The practice of the Customs Service is described in Acree's affidavit which Higgins reviewed in connection with submission of his affidavit. Specifically, Acree states that "... where multiple countries have provided components for an

**8.** The government, in one paragraph of the motion, launches an attack on the qualifications of Vernon Acree. Specifically, the government argues that "[t]he admissibility of Higgins' value-added testimony relies on the admissibility of the testimony of Acree since Higgins is not an expert on Customs practices and regulations and merely bases his opinion on the acceptance of the accuracy of the affidavit of Acree.... There is no evidence that Acree is an expert in the area in which he intends to testify." Gov't Mot. at 18–19. Acree's affidavit states that he was the Commissioner of Customs for five years, at the end of 40 years of federal government service, and that he regularly worked with pertinent Customs law and ATF import applications. *See* Affidavit of Vernon D. Acree (without attachments), Def.'s Ex. 7 to § 2255 Motion ("Acree Aff.") ¶¶ 1–4. That is more than sufficient evidence of his expert qualifications and there is no record evidence that casts any doubt on those qualifications. Since the government does not challenge Acree's proffered testimony on any other ground, his testimony, like that of Higgins, is admissible.

article that is to be imported into the United States, if the last country of export prior to importation into the United States has 'substantially transformed' the article in question, then that country and the manufacturer within that country are properly designated on ATF Form 6(a) [9] for Customs purposes." Acree Aff. ¶ 5. Continuing, Acree says " . . . the correct manufacturer and country of origin . . . [for purposes of ATF Form 6(a) ] is the last country and manufacturer where a substantial transformation has taken place *with a guideline of the manufacturer performing 35% or more in value added to the article." Id.* ¶ 5 (emphasis added). Based on the Acree affidavit, Higgins concludes in his affidavit that because, to his knowledge, the ATF had no rules or regulations governing the country of origin entry on ATF Form 6A, " . . . ATF's position would have been to accept the Customs rulings." *Id.*

The Higgins affidavit was not offered by defendant as proof that value-added was the law. Defense counsel noted that at the August 9, 2001 habeas hearing:

> MR. HADDAD: . . . our view . . . is that without at all disturbing your Honor's ruling that as a matter of law it would be impermissible to use the value-added approach to substantial transformation, . . . there is nevertheless the question of whether a reasonable person at that time could have concluded that the value added approach to a substantial transformation was the law, was how the Government would address this and that would be the way you wanted to follow the law and apply the test.
>
> And that's where in the guise of expert testimony we think it would have been appropriate for the jury properly

instructed that this is not the law to hear that.

Hr'g T. at 209.

The principal issue presented in the § 2255 motion was not the *actual* legitimacy of the value-added concept. Rather, the issue in that motion was whether defendant could have reasonably believed in the legitimacy of that concept. *Jasin,* 215 F.Supp.2d at 572. "[W]here the element of willfulness is critical to the defense, the defendant is entitled to wide latitude in the introduction of evidence tending to show lack of intent." *Garber,* 607 F.2d at 99. Higgins' proffered testimony is admissible on that issue.

There is an additional reason why Higgins' proposed testimony is admissible which is not related to defendant's state of mind—it is admissible with respect to the relationship between substantial transformation and value added, and the value added evidence. That relationship between the two concepts was briefly mentioned in a footnote in Defendant's Opposition to the Government's Motion for Reconsideration and defendant's Reply to Government's Reply to Defendant's Motion under 28 U.S.C. 2255. And, in the August 8, 2002 Memorandum, in considering Higgins' proposed testimony, the Court observed that "[h]ad trial counsel presented this material [Higgins' affidavit], the Court may or may not have decided to charge the jury on the value-added concept." *Jasin,* 215 F.Supp.2d at 570. The Court, after reviewing the record in connection with the motion for reconsideration, now deems that issue extremely important.

At trial, the Court ruled that the value-added concept was not supported by the evidence presented at trial. T., Dec. 2, 1992, at 181–86; App. at 3187–92. Accord-

**9.** ATF Form 6A is the application for permission to import a defense article.

ingly, based on that lack of evidence, the Court denied trial counsel's request for a jury instruction on value-added. Although the Court was shown a copy of the Acree affidavit prior to that ruling, that affidavit was not in evidence and therefore not relied upon. The Court of Appeals, in affirming that ruling, expressly stated that the "evidence" provided ". . . no basis to overturn the District Court's conclusion." *United States v. Jasin,* mem. op. at 16–17 (3d Cir. Aug. 12, 1999).

On reconsideration the Court concludes that the Higgins and Acree affidavits provide evidence of the relationship between the value-added theory and substantial transformation. Specifically, Higgins states in his affidavit that ". . . where there is a question with respect to the proper classification or categorization of items to be imported . . . ATF would look to U.S. Customs for guidance when the terms in question are not specifically defined in ATF laws or regulations." Higgins Aff. ¶ 6. In describing the practices of the Customs Service, Acree states in his affidavit that under Customs rulings, ". . . the last country and manufacturer where a substantial transformation has taken place with a guideline of the manufacturer performing 35% or more in value added to the article . . ." is the country of origin to be designated on ATF Form 6A. Acree Aff. ¶ 5. The import of this testimony is that it ties the value-added concept to what the Court ruled was the applicable law, substantial transformation. It is relevant to the question whether an increase of 35 percent in labor and material costs to the pre-transformation value of an object—value added—resulted in a substantial transformation of the missile dummies sufficient

to make Italy the country of origin. Had trial counsel located an ATF expert like Higgins and presented testimony from that expert and Vernon Acree,[10] the Court might have ruled differently on the value-added instruction. Defendant certainly was prejudiced by the failure of trial counsel to call such witnesses at trial.

**(3.) *Yates' Qualifications and the Admissibility of His Proposed Testimony***

**(i.) Yates' Qualifications**

The government does not challenge Yates' qualifications to opine on missile technology in the motion for reconsideration. Yates, a retired Colonel in the U.S. Army Reserve who has a Ph.D. in Electrical Engineering, is also a ". . . former Senior Executive Service member leader of the United States Army Missile Command's Research Development, and Engineering Center's Guidance and Control Directorate." Aff. of Robert E. Yates, Def.'s Ex. 5 to § 2255 Motion ("Yates Aff.") ¶ 1. As of the date of his affidavit, September 13, 1994, Yates was ". . . Chief Technical Officer of AGRI, Inc., an engineering service company providing support to the U.S. Army Missile Command and U.S. Army Space Defense Command. . . ." *Id.* In his career of industrial and government service, Yates has ". . . been involved in the full spectrum of design, development, manufacturing, and testing of tactical missile systems . . ." and has served as an advisor on a number of U.S. Army missiles used on helicopters or under development for that type of launch application. *Id.* ¶ 2. Based on the authority cited in § V.A.2.(b.)(2.)(i.) of this Memorandum,

---

**10.** The Court notes that trial counsel stated during the charging conference that ". . . a former commissioner of customs, head man, the boss, at customs is likely to testify in this case . . ." T., Nov. 25, 1992, at 197; App.

2489. Trial counsel was undoubtedly referring to Acree but he never called him or any other individual fitting that description as a witness at trial.

*supra*, the Court concludes that Yates would qualify as an expert on missile technology.

### (ii.) Admissibility of Yates' Expert Opinions

The government next argues that Yates' proposed testimony is not admissible because it is "... not clear on what basis he formed his opinions," and his opinions "... apparently [are] based solely on what the defense has told him, which is unknown to the government and the Court." Gov't Mot. at 27, 29.

That argument is rejected on the ground that Yates' affidavit presents the necessary foundation for his opinions. In his affidavit, Yates explains the results of his "... qualitative assessment of the 'value added' ..." to the Striker missiles. Yates Aff. ¶¶ 3–5 (explaining technical analysis of Striker missile dummies). He states that the creation of a "surrogate missile" requires a great amount of engineering work "... to correctly ballast the missile to ensure that the surrogate is dynamically and kinematically equivalent ..." to an armed missile. *Id.* ¶ 4. That is the "domina[nt] expense" in creating a surrogate missile. *Id.* According to Yates' affidavit, "... the value added by the Italian Company, Elmer ... would constitute at least 90% of the worth of the missile parts sent from South Africa to Italy, and subsequently imported or planned for importation, into the U.S." *Id.* ¶ 6. In light of this finding, Yates concludes "... that Elmer made significant transformation enhancements, exclusive of telemetry equipment, which exceeded 35% of the value of the South African parts imported into the United States." *Id.* ¶ 7.

That opinion is relevant because, together with the Higgins and Acree affidavits, it provides evidence of the relationship between the value added concept and substantial transformation. Specifically, as with Higgins' proffered testimony, the import of such testimony is that an increase of 35 percent in labor and material costs to the pre-transformation value of an object results in a substantial transformation of the object. On that issue Yates opined that such an increase occurred in all of the missile dummies, separate and apart from telemetry. If, as Acree states, Customs rulings define substantial transformation as value-added of 35 percent or more and the last country where such a substantial transformation takes place is deemed the country of origin to be designated on ATF Form 6(a), and if, as Higgins states, ATF would have accepted the Customs rulings, Yates' testimony would have been relevant to the question whether the work performed on the surrogate missiles by Elmer in Italy resulted in a substantial transformation sufficient to make Italy the country of origin. Had such evidence been in the record, the Court's ruling on the value-added instruction might have been different.

The government's remaining objections to Yates—namely that his conclusions are "factually inapposite" because "... Elmer's $140,000 bill to ISC ... was based solely upon the telemetry work provided," and only one of the eleven imported units contained telemetry, and that "... certain assumptions accepted by Yates are not true," namely, that all of the engineering work at Elmer in Italy was conducted by Italian engineers—are also rejected.

With respect to the telemetry issue, Yates states in his affidavit that Elmer added value of more than 35 percent to the value of the missile dummies exclusive of telemetry. The government, on cross examination, would have been able to question Yates on how he reached that conclusion. That same analysis applies to the government's objection to his testimony on the ground that he assumed the engineer-

ing work at Elmer in Italy was performed by Italian engineers.

These arguments by the government do not negate prejudice resulting from trial counsel's failure to investigate the need for, and call at trial, a military missile expert. The Court, in ruling on that issue with respect to Yates, concluded that his testimony "... would have thus solidly rebutted the government's evidence that the missiles actually imported did not have sufficient value added to change the missile dummies' country of origin." *Jasin,* 215 F.Supp.2d at 576. That failure on the part of trial counsel prejudiced defendant.

### 3. *The Government's Remaining Objections*

#### (a.) Defendant Did Not Rely on Opinions

█ The government also challenges the Court's reliance on the testimony of Higgins and Yates by arguing that there is no evidence that either Higgins or Yates communicated with defendant or that defendant relied on their advice. Gov't Mot. at 20–22, 31.

The Court rejects that argument. The issue presented has nothing to do with whether defendant relied on the advice of experts like Higgins or Yates—defense counsel conceded at the August 9, 2001 evidentiary hearing that defendant did not consult any of the experts who submitted affidavits.[11] Rather, the issue is whether defendant's belief in the value-added concept was reasonable and whether the Court should have charged the jury on the value added concept as it relates to substantial transformation. Higgins' pro-

posed testimony was relevant on those issues.

#### (b.) Unavailability of Higgins at Trial

█ Finally, the government argues that defendant would not have been able to call Higgins at trial because he was then the director of the ATF and thus was subject to federal regulations limiting his availability to testify. Gov't Mot. at 16 n. 10. The government bases that argument on the so-called "Touhy regulations," 28 C.F.R. § 16.12 *et seq.*—adopted after the Supreme Court's decision in *United States ex rel. Touhy v. Ragen,* 340 U.S. 462, 71 S.Ct. 416, 95 L.Ed. 417 (1951)—which set forth, *inter alia,* the procedures to be followed in subpoenaing a government employee.

The Court rejects this argument because the government did not raise any argument concerning Higgins' availability in opposing the § 2255 motion. In Higgins' supplementary affidavit, submitted to the Court as part of Defendant's Motion to Supplement and Clarify the Record, which was filed on February 12, 2001, he declared that he would have declined to testify at defendant's trial "... because I was, at that time, the Director of the Bureau of Alcohol, Tobacco and Firearms." Decl. of Stephen E. Higgins, Def.'s Ex. to Mot. to Supplement and Clarify the Record ("Higgins Decl.") ¶ 4. The Court granted that Motion by Order dated February 27, 2001. At that time the government was made aware that the record included an affidavit from Higgins specifically stating that he would have been unavailable at trial and could have objected to it then. The gov-

---

11. Defense counsel's concession that defendant did not rely on the testimony of Acree, Higgins or Davis, or any expert, is evidenced in the following colloquy:

 THE COURT: Well, let me ask you a question: Did Jasin know this at the time? In other words, did he have in his mind, did

anyone tell him, and I think I know the answer to this, this is a rhetorical question, about what Acry [*sic*] and Higgins and Davis said. I think the answer to that is no.

 MR. HADDAD: The answer to that is no. Hr'g T. at 279.

ernment's belated arguments with respect to Higgins' unavailability are an impermissible ground for reconsideration. *Smith,* 155 F.R.D. at 97; *Reich,* 834 F.Supp. at 755.

The Court also rejects the unavailability argument because the Court did not base its ruling on prejudice on the assumption that only Higgins could have provided expert testimony concerning value-added. To the contrary, the Court, in the August 8, 2002 Memorandum, found "... prejudice in counsel's failure to follow up on defendant's request that he find an ATF expert and a United States government military expert." *Jasin,* 215 F.Supp.2d at 566. In fact, defendant had located such a person—Rex D. Davis, who served as Director of ATF before Higgins. That affidavit also was received in the record as part of Defendant's Motion to Supplement and Clarify the Record. Davis headed ATF for six years and served in ATF and its predecessor organizations for 29 years. Decl. of Rex. D. Davis, Def.'s Ex. to Mot. to Supplement and Clarify the Record ("Davis Decl.") ¶ 3. Davis' proposed testimony—presented in his affidavit—is identical to that of Higgins. He states that "[i]n the absence of different laws or regulations specifically governing ATF, ATF looks for guidance to the United States Customs Service," and that "... ATF's position would have been to accept the rulings of U.S. Customs concerning the country of origin and manufacturer of the missile components at issue in this case." *Id.* ¶¶ 4,7. The Davis declaration thus refutes the government's suggestion that the Court based its decision on mere speculation about the availability of another witness with similar opinions if, as was the

case, Higgins could not have testified. There was no speculation. The witness—Davis—has already been found, and his declaration is in the record.

### 4. *The ATF Opinion Letters Stating ATF Would Not Have Referred to Customs Service Practices in the Circumstances Presented*

The Court has already ruled in § III of this Memorandum, *supra,* that the two opinion letters drafted by ATF officials—a letter dated September 21, 1995 and a letter dated March 30, 1995—are new evidence that was previously available. Thus, such evidence cannot be the basis of a motion for reconsideration. *Pavlik,* 135 F.3d at 882 n. 2. Nevertheless, the Court will consider that evidence in addressing the question whether reconsideration is required to correct a clear error of law or prevent manifest injustice.

The opinion letters may or may not be relevant to the issue presented in the § 2255 motion and the motion for reconsideration—the question whether ATF would have referred to Customs Service practices on the issue of the appropriate country of origin to list on ATF Form 6(a). However, even assuming that these letters are relevant to that question,[12] at most for the government the letters could be used in rebuttal (or in the government's case-in-chief) to rebut the proffered evidence of Higgins, Acree and Yates. The letters do not change the Court's conclusion that defendant was prejudiced by trial counsel's failure to interview and call at trial witnesses like Higgins, Acree and Yates. The letters do not establish clear error or manifest injustice.

**12.** The Court notes that the opinion letters deal with a Chinese arms embargo imposed in 1994 and were written in 1995.

## B. THE GOVERNMENT'S CHALLENGES TO KERNS, GALLAGHER AND GUERIN

### 1. *Kerns*

#### (a.) Defendant Did Not Rely on Kerns

The government first argues that the affidavit of Kerns is irrelevant because defendant did not rely on the opinion or advice of Kerns or his employer, the Sikorsky Aircraft Division of United Technologies Corp. Gov't Mot. at 33–35. That argument is rejected on the ground that it is a new argument. The government did not raise that argument in any of the briefs in opposition to defendant's § 2255 motion and does not now argue that it was precluded from doing so. As such, the argument is an impermissible ground for a motion for reconsideration. *Smith*, 155 F.R.D. at 97; *Reich*, 834 F.Supp. at 755.

That argument is also rejected because it cannot be the basis for a finding of clear error or manifest injustice. In the August 8, 2002 Memorandum, the Court concluded that Kerns' testimony regarding Sikorsky's legal review of the Striker program would have constituted "independent corroboration." *Jasin*, 215 F.Supp.2d at 575. That conclusion was based on the well-established principle that a defendant is entitled to present testimony independently corroborating an asserted defense to the crimes charged. *Id.* (citing *Nealy v. Cabana*, 764 F.2d 1173, 1179 (5th Cir.1985) (discussing, in *Strickland* prejudice analysis, importance of testimony that would have supported defendant's credibility as to facts underlying defense)). "Accordingly, had trial counsel interviewed and called Kerns as a witness as defendant requested, Kerns' testimony would have established that defendant received information about Sikorsky officials' views of the legality of importing the missile dummies *from a source independent of ISC.*" *Id.* at 573. Such testimony would have rebutted the government's argument that defendant's belief about value-added was merely a "concoction," that defendant had "duped" ISC counsel into believing it. Defendant's reliance on the opinion or advice of Kerns or the Sikorsky legal review is not an issue.

#### (b.) Defendant's Possession of the Sikorsky Memorandum

The government's next argument relates to the use of the Sikorsky Memorandum to corroborate defendant's good-faith belief. The Sikorsky Memorandum is an internal memorandum dated July 18, 1986, that stated the missile dummies at issue, "... though they may have originally been designated and developed by the Republic of South Africa, *would not be considered as such* providing, the missile(s) imported are a manufacture *or assembly* of ISC Group in the United Kingdom or any country other than the Republic of South Africa." Defs' Trial Ex. D–82. Specifically, the government argues that defendant had possession of the Sikorsky Memorandum before trial and "... had Jasin in fact relied on the Sikorsky legal review in forming his state of mind, the document would have jogged Jasin's memory and he could have so testified." Gov't Mot. at 36.

That argument is rejected on the ground that it is a new argument that the government did not raise it in its prior submissions or at the August 9, 2001 habeas hearing. Thus, the argument is not properly the subject of a motion for reconsideration. *Smith*, 155 F.R.D. at 97; *Reich*, 834 F.Supp. at 755.

The argument is also rejected because it fails to show manifest injustice or clear error. The Court concludes, as it did in the August 8, 2002 Memorandum, that the Sikorsky Memorandum would have bolstered defendant's good-faith defense at trial. Kerns' proposed testimony would have enabled defendant to offer the Memo-

randum in evidence. Even without Kerns' testimony, trial counsel could have presented the Memorandum to defendant and asked him whether it refreshed his recollection, but he did not do so. Because the latter issue was not briefed, the Court does not rely on it in denying the motion for reconsideration.

### (c.) Was the Sikorsky Memorandum Based on False Representations?

Finally, the government argues that the Sikorsky Memorandum does not support defendant's value-added theory because it is based on representations that all components and manufacturing were to be of non-South African origin. Gov't Mot. at 46–47. The Court rejects that argument on the ground that it was addressed by the Court in the August 8, 2002 Memorandum. In that Memorandum, the Court ruled that "[w]hatever information defendant may have hidden from Kerns—if he in fact did so—is irrelevant ... because even if, as the government argues, defendant hid the South African involvement in the production process, Kerns' affidavit states that missile *assembly* in another country would have rendered permissible the importation of the missile dummies into the United States." *Jasin,* 215 F.Supp.2d at 574 (emphasis added). The Court also stated in the August 8, 2002 Memorandum that Kerns' statement "... hinging the legality of importation on 'assembly' in 'any country other than South Africa' supports defendant's argument ..." that Kerns' testimony would have demonstrated defendants subjective good

faith belief that importation of the missile dummies was legal under a value-added theory. *Id.* at 573 n. 18. Moreover, the question of false representations could have been addressed at trial on cross examination. Any such false representations do not support the government's claim of clear error and manifest injustice.

### (d.) The Schmidt 302 and Zemetis 302

■■■ The Court has already ruled in § III of this Memorandum, *supra,* that the Schmidt 302 and Zemetis 302 are new evidence that was previously available. Thus, such evidence cannot be the basis of a motion for reconsideration. *Pavlik,* 135 F.3d at 882 n. 2. Nevertheless, the Court will consider that evidence in addressing the question of whether reconsideration is required to correct a clear error of law or prevent manifest injustice.

The Sikorsky Memorandum concludes that the importation of the missile dummies was lawful. The Schmidt 302 and the Zemetis 302 are offered as evidence that the conclusion was based on the representation that all components were to be of non-South African origin. According to the 302's, the South African origin of the missile dummies was "hidden" from Sikorsky. Such evidence, to the extent that it is admissible,[13] could be used to cross examine Kerns or introduced as rebuttal evidence or in the government's case-in-chief. It does not establish clear error or manifest injustice.

---

**13.** The Court notes that Zemetis states in his 302 that "... he has very little recollection of the circumstances surrounding the efforts to integrate ISC's Striker missile with the SIKORSKY helicopter." He further states that "... he did not have any direct contact with anyone from ISC ..." and "[h]is knowledge of the Striker would most likely have come from STEVE SCHMIDT." Gov't Mot. Ex. C.

The fact that Zemetis lacked personal knowledge of some of the things he said in his 302 raises an issue of admissibility under Federal Rule of Evidence 602—"A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."

### 2. *Gallagher*

#### (a.) Value–Added Theory

The government argues that the Court committed clear error in considering Gallagher's proposed testimony on value added because, if Higgins' testimony is excluded, the value-added issue would not be relevant. In advancing this argument, the government urges the Court to treat Gallagher's testimony in the same manner as the affidavit of Giovanni Paladini, Chairman of Elmer, which was submitted in support of defendant's Motion for New Trial Pursuant to Fed.R.Crim.P. 33 Based Upon Newly Discovered Evidence ("Motion for a New Trial"). In ruling on that motion, the Court refused to consider Paladini's affidavit on the ground that fact testimony on value added was not relevant because the value added concept was not material to the issue of substantial transformation of the missile dummies. The government contends that "[a] consistent ruling by the Court would similarly find that Gallagher's testimony is not material." Gov't Mot. at 52–53.

The Court rejects that argument because it fails to show clear error or manifest injustice. The Court's ruling on the new trial motion was based on a different standard of review than defendant's § 2255 motion—it was based on *United States v. Iannelli*, 528 F.2d 1290, 1292 (3d Cir.1976). The *Iannelli* standard requires a defendant seeking a new trial based on newly discovered evidence under Federal Rule of Criminal Procedure 33 to show that new evidence not presented at trial ". . . would probably produce an acquittal." *Id.* That is a much more stringent standard than the *Strickland* "reasonable probability" standard that applied to defendant's § 2255 proceeding. *See Gray,*

878 F.2d at 710 (stating that *Strickland* ". . . standard of proof is not as high as the standard applied to a motion for a new trial based on newly discovered evidence under Fed.R.Crim.P. 33, since, as the Court stated in *Strickland,* the high standard for newly discovered evidence claims presupposes that there was an accurate and fair proceeding").

Gallagher's proposed testimony is relevant on the question of defendant's state of mind and the issue of the relationship between value added and substantial transformation. Specifically, his proposed testimony would have provided evidence of the value added to the missile dummies by Elmer.[14] Had such evidence and the evidence set forth in the affidavits of Higgins, Yates and Acree been included in the trial record, the Court might have ruled differently on the request for a value added instruction.

#### (b.) Gallagher's Proposed Testimony was Cumulative

The government next argues that the Court committed clear error in relying on Gallagher's proposed testimony because such testimony would have been cumulative of other testimony presented at trial, specifically that of defense witnesses Philip Ambrose, Brigadier General Robert W. Pointer, Jr. and David Ellis, all of whom testified as to Elmer's "value added" work. Gov't Mot. at 53 & n.20.

That argument is rejected on the ground that the Court addressed it in the August 8, 2002 Memorandum. In that Memorandum, the Court concluded that Gallagher's testimony would not have been cumulative for the following reasons: (1) Gallagher would have been able to testify as to his actual observations of the work performed

14. In view of this analysis, Paladini's proposed testimony would also be relevant on the value-added issue.

at Elmer, (2) none of the witnesses named by the government as rendering Gallagher's testimony cumulative provided this perspective, and (3) the only witness whose testimony involved personal observation of the missile dummies was Ambrose and his testimony merely described the condition of the missile surrogates after they reached the United States—it did not verify, as did Gallagher's proposed testimony, that the assembly work was done by Elmer in Italy. *Jasin*, 215 F.Supp.2d at 577–78. Because the government's argument was previously raised and expressly rejected by the Court, it cannot be raised again. *Smith*, 155 F.R.D. at 97; *Rottmund*, 813 F.Supp. at 1107.

### 3. *Guerin*

#### (a.) Speculation Regarding Guerin's Potential Testimony

The government argues that the Court committed clear error in concluding that defendant's good-faith defense had been prejudiced by trial counsel's failure to interview and call Guerin at trial as a witness because the Court "supplied speculation" as to Guerin's potential testimony. Gov't Mot. at 2, 56, 59–60. Specifically, the government faults defense counsel for failure to "... present Guerin at the habeas hearing...." *Id.* at 56.

The Court rejects that argument because, as explained in §§ I and V.A.1 of this Memorandum, *supra*, the government agreed with the Court's determination that all issues raised in defendant's § 2255 motion could be decided on the parties' submissions. The government declined the opportunity to have Guerin present at the hearing and, as Guerin was in federal custody at that time, it would have been a simple matter for the government to produce him.[15] For the reasons set forth in

§§ I and V.A.1 of this Memorandum, *supra*, the Court concludes that the government waived any objection relating to the failure to present Guerin at the hearing. *Smith*, 155 F.R.D. at 97; *Reich*, 834 F.Supp. at 755.

The Court also rejects the government's argument that the Court "supplied speculation" of Guerin's proposed testimony for a second reason—the content, relevance and exculpatory value of Guerin's testimony is detailed in the Court's August 8, 2002 Memorandum. Defendant appended to his § 2255 motion documentation showing that had Guerin testified he would have confirmed that he told defendant ISC had approval for its export activities. *See* Def.'s Ex. 14 to § 2255 Motion. In a letter that Guerin prepared on defendant's behalf prior to defendant's trial, Guerin said with regard to the "South African Shipments": "I implied to Tom [defendant], as I did to several others, that we had Washington's 'blessings' on this activity. I interfaced a lot with Washington contacts and fed them a lot of information. But I did *not* have their approval for such shipments in writing. Jasin did not know this." *Id.* Guerin further stated "concerning my other offenses" that "Jasin has no knowledge of, or participation in, *any* of the offenses for which I was charged ..." and that Guerin "... *never* discussed any of those issues with him at any time; nor would he, in his position, have become involved in any of those offenses." *Id.* In another letter, this one addressed to a friend, Guerin urged the recipient to have defendant's counsel call his own lawyer to prepare for any testimony that Guerin might present at defendant's trial, stating that he "... really [did] stand ready to help defendant." Def.'s Ex. 14 to § 2255

---

**15.** The Court notes that the government made such an offer at defendant's trial. *See* T.,

Nov. 30, 1992, at 116; App. at 2626.

Motion. The Court addressed these letters in the August 8, 2002 Memorandum. *Jasin*, 215 F.Supp.2d at 578–80.

Defendant also appended to the § 2255 motion pages from Guerin's presentence report which showed that, in the course of plea negotiations, when Guerin had every incentive to name as many co-conspirators as he honestly could, he did not name defendant. Def.'s Ex. 10. That report disclosed that "Guerin provided the government with evidence against ... [several] defendants, many of whom were *close personal friends of Mr. Guerin* ...." *Id.* (emphasis added). That also was discussed in the Court's August 8, 2002 Memorandum. *Jasin*, 215 F.Supp.2d at 580.

In relying on Guerin's written submissions in the record, the Court concluded in the August 8, 2002 Memorandum that Guerin's testimony would have provided evidence that defendant was never a member of the conspiracy, the sole charge on which he was convicted. *Id.* That is not speculation. It is an analysis of the documentary evidence in the record. Moreover, the government did not contend during the pendency of defendant's § 2255 motion, nor at the August 9, 2001 hearing on that motion, nor in the present motion for reconsideration, that Guerin would have testified to the contrary.

#### (b.) Guerin's Potentially Harmful Testimony

The government next argues that the Court committed clear error in finding that the failure to interview Guerin was prejudicial because "... Jasin had testified that he was demoted for refusing to supply the South Africans with technology," and "Guerin would have established on cross-examination that Jasin had lied to the jury concerning why he was demoted at ISC." The government concludes that Guerin would thus "... disprove an essential claim made by Jasin ..." and thus his

testimony would have been harmful to defendant's defense. Gov't Mot. at 57–58.

That argument is rejected on the ground that the harm alleged by the government is merely tangential when compared to the enormous impact of exculpatory testimony from the leader of the conspiracy that defendant was not involved in any criminal activity. As stated in the August 8, 2002 Memorandum, "[f]or the leader of a wide-ranging and long-running conspiracy to testify that, to his knowledge, the defendant had participated in no illegal activity would call into serious question the defendant's guilt. Failure to present any such evidence was certainly prejudicial to defendant." *Jasin*, 215 F.Supp.2d at 580.

#### (c.) Guerin's "Vague and Inadmissible Opinions"

The government next argues that the Court committed clear error in relying on the claim by Guerin in the letter that " 'Jasin has no knowledge or participation in[ ] any of the offenses for which I was charged, nor would he, in his position, have become involved in any of those offenses....' " The government contends that "Guerin's statement is basically an inadmissible opinion...." Gov't Mot. at 60.

That argument is rejected on the ground that the Court did not base its conclusion with respect to Guerin on an "inadmissible opinion." The Court specifically noted in the August 8, 2002 Memorandum that "... Guerin would not have been permitted to testify, as he wrote in the letter ..., that 'Jasin did not know' that ISC actually lacked Washington approval ..." but Guerin "... could have testified to the circumstances of his interactions with defendant as well as his observations of defendant's work at ISC. Testimony on these points would have supported defendant's argument that he justifiably relied on Guerin's

representations." *Jasin*, 215 F.Supp.2d at 579.

At trial, the government's only evidence that defendant conspired with Guerin and Clyde Ivy, the President of ISC and a key figure in the ISC conspiracy, related to defendant's involvement in the Striker program—ISC's attempt to broker a sale of Striker missiles by South Africa to China. Brokering the sale of missiles by South Africa to China was not illegal; rather, only direct transfers of military hardware and technology between South Africa and the United States were prohibited by federal law. Consequently, the government attempted to show that in the course of pursuing the lawful project of brokering that sale, ISC engaged in certain illegal activities, and that defendant participated in or was aware of those activities, knew that they were illegal, and yet pursued them to further Guerin's broader conspiracy to violate the embargo. Those activities included the importation of several missile dummies for testing, in order to resolve some of the Chinese buyers' concerns.

At trial, defendant argued that he believed the importation of missile dummies was legal because sufficient value was added to the dummies in Italy to qualify Italy as their country of manufacture, rather than South Africa. That argument responded to the charge that defendant was part of the Guerin-led conspiracy and in support of defendant's position that his involvement in the Striker program did not prove his membership in the conspiracy.

Far from being "vague and inadmissible opinions," Guerin's proposed testimony is direct evidence that defendant never entered into an agreement with Guerin to violate the embargo. Defendant was only convicted of conspiracy, not of any substantive violations of the AECA. Guerin was the leader of the conspiracy the government sought to prove. It was important for the jury to have known that Gue-rin did not consider defendant to be a member of the conspiracy. Moreover, the government's evidence that defendant was "... involved in very detailed aspects of the Striker project ..." has absolutely no tendency to show that defendant was a member of the conspiracy, given that (1) the overall goal of the Striker project was legal, and (2) defendant testified he believed that all of those "detailed aspects" were legal as well.

### (d.) Strategic Decision Not to Call Guerin

The government next argues that the Court committed clear error in relying on statements from Guerin because "... there is little reason to believe that trial counsel's failure to present Guerin was anything other than a tactical decision." That argument is rejected because tactical decisions fall under the analysis of the first prong of *Strickland*—namely, whether trial counsel was objectively unreasonable. As noted in § V of this Memorandum, *supra*, the government "... accepts as accurate ..." this Court's ruling that trial counsel was objectively unreasonable in failing to interview Guerin and call him as a witness at trial. The only contested issue is prejudice, and questions of trial strategy are irrelevant to that issue with respect to Guerin's proffered testimony.

### (e.) Guerin's Credibility

The government next argues that the Court committed clear error in relying on Guerin's testimony because Guerin would not have been a credible witness at trial. Gov't Mot. at 65. That argument is rejected because the government seeks to relitigate an argument already addressed by the Court—that is not appropriate on a motion for reconsideration. *Smith*, 155 F.R.D. at 97; *Rottmund*, 813 F.Supp. at 1107. In the August 8, 2002 Memoran-

dum, the Court acknowledged that "Guerin's credibility on some issues—those relating to his guilt—might be questionable," but there ". . . nothing in the record to suggest that Guerin's credibility was suspect as to defendant's involvement in the ISC conspiracy." *Jasin*, 215 F.Supp.2d at 580. Guerin, in pleading guilty to the charges against him, ". . . had strong incentives to name as many co-conspirators as he could. Every bit of assistance he gave to federal prosecutors might have resulted in a decrease in his sentence." *Id.* (citing U.S. Sentencing Comm'n, *Guidelines Manual* § 5K1.1 (allowing downward departure in sentencing upon defendant's substantial assistance to authorities)). Thus, although Guerin's credibility on some issues may be suspect, his exculpation of defendant had "the ring of truth" because it was "squarely against" Guerin's "penal interest." *Id.*

### (f.) Guerin's Proposed Testimony Was Cumulative

Finally, the government argues that the Court committed clear error in ruling that trial counsel's failure to interview Guerin and call him as a witness at trial because Guerin's testimony is ". . . cumulative to that of defense witness [James] Shinehouse." Gov't Mot. at 57 n. 22, 58–59.

The Court rejects the government's argument because it was addressed, and rejected, in the Court's August 8, 2002 Memorandum. In that Memorandum, the Court rejected the government's position that Guerin's testimony would have been cumulative to that of defense witness Shinehouse, who testified about his own conversations with Guerin on the question of Washington approval. That determination was based on the fact that Guerin's proposed testimony ". . . would not have been limited to the mere fact that he told defendant that ISC had Washington approval." The Court also noted in the Memorandum that "[t]he most relevant ev-

idence concerning defendant's purported reliance would have been Guerin's testimony about his discussions with *defendant*, not with Shinehouse." *Jasin*, 215 F.Supp.2d at 579 (emphasis in original). Because this argument has already been raised and addressed by the Court, it cannot be a basis for a finding of clear error. *Smith*, 155 F.R.D. at 97; *Rottmund*, 813 F.Supp. at 1107.

## VI. CONCLUSION

In the August 8, 2002 Memorandum, the Court concluded, based on an analysis of each proposed witnesses' testimony, that "[b]ecause the testimony of the witnesses proposed by defendant would have directly rebutted several of the government's key arguments to the jury, the Court concludes that trial counsel's ineffectiveness was 'sufficient to undermine confidence in the outcome' of defendant's trial." *Jasin*, 215 F.Supp.2d at 582 (citing *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052). None of the arguments presented by the government in its motion requires reconsideration of that determination—there is no clear error or manifest injustice to correct. Thus, the government's motion for reconsideration of the Court's Memorandum dated August 8, 2002 is denied.

An appropriate order follows.

### ORDER

**AND NOW**, this 15th day of September, 2003, upon consideration of Government's Motion for Reconsideration of the Court's Order Granting the Defendant's Motion Under 28 U.S.C. § 2255 (Document No. 272, filed October 18, 2002) and the related submissions of the parties, Defendant's Opposition to the Government's Motion for Reconsideration (Document No. 273, filed November 22, 2002), Government's Reply to Defendant's Opposition to Government's Motion for Reconsideration of the Court's

Order Granting the Defendant's Motion Under 28 U.S.C. § 2255 (Document No. 274, filed December 13, 2002) and supplemental letter from Mark E. Haddad, Esquire, dated May 15, 2003,[1] for the reasons set forth in the attached Memorandum, **IT IS ORDERED** that the Government's Motion for Reconsideration is **DENIED.**

**IT IS FURTHER ORDERED** that copies of the following letters—the Court's letter dated August 2, 2001 addressed to counsel and defense counsel's letter dated August 3, 2001 to the Court—shall be docketed by the Clerk of Court.

1. A copy of the letter shall be docketed by the Clerk of Court.